**MOODY et al. v. WAGNER et al.**

No. 21946.   Opinion Filed June 27, 1933.

J. C. Denton, R. H. Wills, J. H. Crocker, I. L. Lockewitz, and J. P. Greve, for plaintiffs in error.

Blakeney & Ambrister, for defendants in error.

BUSBY, J. This action was commenced in the district court of Lincoln county in April of 1927, by John Wagner, L. C. Ross, Roy Dawson, and E. C. Love, who sought in their first cause of action to recover a money judgment against the Mid-Continent Petroleum Corporation for the value of oil and gas produced from the N. W. ¼ of section 8, twp. 15 north, and range 6 east of the Indian Base and Meridian. In a second cause of action plaintiffs also sought to recover punitive damages for alleged malicious slander of title to an oil and gas lease, which slander plaintiffs claimed was caused by the defendants' placing of record in the office of the county clerk of Lincoln county an affidavit claiming a lien on said leasehold interest.

The cause was tried to the court, and on the 14th day of May, 1930, the court rendered judgment for the plaintiffs in the sum of $23,287.75 on their first cause of action and for the sum of $5,000 punitive damages on their second cause of action.

The defendants have appealed from this judgment, and the respective parties appear in this court in the reverse order. They will be referred to in this opinion as they appear in the trial court.

In November of 1924, one Claud Russell Earp, a minor, was the owner of a 2/33 interest in the land above described. Through his guardian, Mary E. Earp, an oil and gas lease for a term of five years and as long thereafter as oil and gas should be produced from the premises in paying quantities by the lessee, was executed to John Wagner, one of the plaintiffs herein. Wagner subsequently assigned fractional interests in the lease to the other plaintiffs.

Just before the lease was executed to John Wagner, the owners of the other 31/33 interest in the same property executed an oil and gas lease to the Cosden Oil & Gas Company. This lease was thereafter assigned to the Mid-Continent Petroleum Corporation. That corporation entered upon the premises under the lease and developed the same for oil and gas. It obtained profitable production.

The lease of Wagner and his assignees, who will be referred to as his associates, provided that if no well should be commenced on the premises within one year, the lease should terminate unless delay rentals should be paid to defer the time of drilling, and that the payment of such delay rentals should operate to extend the time for the commencement of a well for one year. It was also provided that during the exploratory period of the lease the time to commence drilling could be deferred annually by the payment of such rentals. Wagner and his associates paid only one delay rental, thereby deferring time for drilling under the lease until November of 1926. Before that time the Mid-Continent Petroleum Corporation had obtained profitable production from the premises, and Wagner and his associates relied upon the operations of the Mid-Continent as a compliance with the provisions of their lease. Claude Russell Earp, their lessor, also treated the production by the Mid-Continent Petroleum as a compliance with the provisions of the lease for about two years after November of 1926. During this period of time, the parties interested in the premises recognized that Wagner and his associates were entitled to participate in the production which resulted from the drilling operations of the Mid-Continent Petroleum Corporation. About the time that an answer was due to be filed in this case, it occurred to the attorneys for the Mid-Continent that there might be

a serious question as to whether the lease of Wagner and his associates had terminated in November, 1926, by failure on the part of the lessees to drill or pay delay rentals. They further questioned the right of Wagner and his associates to participate in the proceeds of the production even though the lease had not terminated. They so advised Claude Russell Earp, who thereupon filed an action in the district court of Lincoln county, seeking a judicial declaration that the lease of Wagner and his associates had terminated, and seeking to have the same declared a cloud upon the title of the plaintiff in that action. That lawsuit was tried and appealed to this court and is cause No. 21245 herein. It is styled "Claude Russell Earp, Plaintiff in Error, v. Mid-Continent Petroleum Corporation et al., Defendants in Error." 167 Okla. 86, 27 P. (2d) 853. The issues involved in that controversy have been this day decided. The statement of facts and the rules of law contained in the opinion in that case will be treated with brevity herein. That opinion should be read in conjunction herewith.

In that case it was decided that by virtue of the execution and delivery of the lease to John Wagner, he became a cotenant with the Cosden Oil & Gas Company, lessees of 31/33 of the premises. That subsequent assignments made John Wagner and his associates tenants in common with the Mid-Continent Petroleum Corporation.

It was also therein determined that the duration of the cotenancy depended upon the lease of Wagner and his associates; that by virtue of a contemporary construction placed upon the lease contract by the parties thereto, the drilling of the Mid-Continent was a compliance with that provision of the lease requiring the payment of delay rentals or the commencement of a well upon the premises within one year to prevent the termination of the lease. This court reached the conclusion, however, that such contemporary construction did not operate to extend the terms of the lease beyond the five years from the date of its execution.

In the case referred to, this court recognized that it was the settled law of this state that each tenant in common has the right to enter upon the common premises and explore and develop the same for oil and gas and to produce such products from the premises, provided, however, that a cotenant cannot exclude his cotenant from exercising the same right with reference to the common property. It was also decided as a matter of law in that case that each

tenant in common had the right to execute a separate lease which is effective as to his portion of the common property, and that upon the execution thereof his lessee becomes and is a cotenant with the cotenants of the lessor during the period of the lease, and that lessees under separate leases obtained from different cotenants are cotenants with each other. It was also determined that as cotenants they are entitled to share in the production from the premises by other cotenants.

Claude Russell Earp and his grantees, who were Wagner and his associates, were entitled to receive 1/8 of 2/33 of all oil and gas produced from the premises by virtue of the provisions for royalties contained in their leases.

This proportionate portion of the oil and gas was subject to the prior rights of the Mid-Continent Petroleum Corporation to deduct from the market value of the oil and gas produced the reasonable and necessary cost of development, extraction, and marketing the same. However, since the amount of oil and gas produced from the premises at the time of the trial was of such a quantity that 2/33 of the net proceeds of the same was in excess of 1/8 of 2/33 of the gross amount produced, no question of deduction from the royalties of Earp and his grantees need be considered.

Wagner and his associates were entitled to receive from the Mid-Continent Petroleum Corporation 7/8 of 2/33 of the market value of the oil and gas produced from the premises less the reasonable and necessary cost of developing, extracting, and marketing 2/33 of the total amount received.

The measure of accounting was established in the case of Prairie Oil & Gas Co. v. Allen, 2 F. (2d) 566, wherein the court said that the producing lessee was liable to account for "market value of the oil produced less the reasonable and necessary expense of developing, extracting, and marketing the same." The principal difficulty in this case arises out of the application of this rule to the fact situation presented by the record.

In order to apply the rule to the case at bar, it is essential that we examine the judgment and the various items thereof. The judgment for $23,287.75 includes the following separate items:

"(1) $6,907.99 for the proceeds of oil in the hands of the defendant, Mid-Continent Petroleum Corporation.

"(2) $5,999.49 for the proceeds of oil in the hands of the Prairie Oil & Gas Company.

"(3) $2,776.33 for erroneous charges in connection with residue gas used in operating the property involved.

"(4) $1,090.29 for warehouse or handling charges in connection with supplies and materials furnished by the defendant, Mid-Continent Petroleum Corporation.

"(5) $1,014.48 for casinghead gas run to the cashinghead gasoline plant of the defendant, Mid-Continent Petroleum Corporation.

"(6) $516.88 for cashinghead gas run to the cashinghead gasoline plant of the defendant, Mid-Continent Petroleum Corporation.

"(7) $647.45 for casinghead gas which was turned into the air by the defendant, Mid-Continent Petroleum Corporation.

"(8) $4,336.84 charges against the plaintiffs in connection with the drilling of well No. 1 by the defendant, Mid-Continent Petroleum Corporation."

The defendant Mid-Continent Petroleum Corporation concedes that the first three items enumerated above are correct in amount. It denies any liability as to the fourth item in the judgment for $1,090.29. The record shows that in calculating the cost of developing the premises and producing oil therefrom, the Mid-Continent added to the catalogue price of supplies and material used on the premises a warehouse or handling charge varying from five to ten per cent., and charged the same against the market value of the oil produced from the premises as a part of the cost of production. This $1,090.29 item constitutes 2/33 of such added charge. The record discloses that producing oil companies, in order to fortify themselves against a shortage of supplies and the consequent suspension of drilling operations that might result from their inability to procure the same when needed, maintain warehouses wherein such supplies are kept. The warehouse charge is made against the supplies to defray the cost and expense of the maintenance of these warehouses. The proof shows that this is the prevailing custom of the oil field, based upon necessity, and that the amount charged in this case does not exceed the customary charge made and is therefore reasonably necessary to defray the costs of maintaining the warehouses.

Bearing in mind that Wagner and his associates refused to assume personal liability in this case for the cost of development and production, we think the following language of the New Jersey court is peculiarly applicable:

"* * * The tenant who keeps aloof and free from risk until the hazards have all been run and the dangers are all past and then comes forward seeking to share in the profits of a venture he had not the courage to join, and to the success of which he has contributed nothing, certainly is not in a position to demand that the court, in ascertaining what the profits are, shall be cautious almost to niggardliness toward those whose capacity and enterprise have made the venture a success." Edsall v. Merrill, 37 N. J. Eq. 114.

This court had for consideration a problem involving a similar question in the case of Ft. Dearborn Trust & Savings Bank v. Skelly Oil Co., 146 Okla. 179, 293 P. 557. In that case it was said:

"It being an established custom in business where numerous personnel is required to carry on the work, to keep records and to have supervisory and administrative staff to direct and co-ordinate the work, this court would not say as a matter of law that such expense is unnecessary or unreasonable. It is therefore proper to allow as an actual expense in operating oil and gas leases so-called 'overhead expenses.' "

Applying the rule and reasoning to the case at bar, we hold that this warehouse or handling charge of $1,090.29 was proper and legitimate and a part of the necessary cost of developing and production. Therefore the trial court committed error in holding that the same was an improper deduction and in including this amount in the judgment rendered against the defendants.

Because of the similarity of the problems involved, we will next consider the contention of the defendant concerning item 8. This was an item for $4,336.84, representing 2/33 of the cost of drilling well No. 1, which sum was charged against Wagner and his associates' share of the total amount of oil and gas produced from the premises. The plaintiffs say this well was dry. The defendants say it was a small producer. On this view we take, it makes little difference which it was. The production from it was unprofitable, and the plaintiffs seek to separate it from the other well. It was a part of the development of the entire premises, and the language quoted previously from Edsall v. Merrill, supra, is again applicable. Plaintiff and his associates, while unwilling to share in the handling of development, now desire to separate the good from the bad wells and escape a portion of the burden of development. Obviously this would be inequitable. In the case of Connette v. Wright (La.) 98 So. 674, it was said:

"Plaintiff, likewise, without the approval and consent of defendant, drilled a number

of wells on still another of the tracts affected by the lease, known as Shaw B. lease. While a few of these wells proved to be nonproducers, the lease, as a whole, yielded more than one million barrels of oil, defendant's proportion of which he sold to the Standard Oil Company under a division order, and for which he was paid.

"Defendant's contention, raised by way of answer to plaintiff's supplemental petition, is that, having never agreed to the drilling of any of the wells, he could not be held for the cost of dry holes, and other wells not accepted by him, for locations without development and other expenses which did not inure to his benefit; although, as a matter of equity he stood ready and willing to pay his pro rata share of a reasonable amount expended in drilling such wells as produced oil, of which he accepted his proportion; and he accordingly admitted an indebtedness to plaintiff of $41,877.73. * * *

"The execution of the division orders and the receipt of his share of the proceeds of all of the oil produced and sold was a complete ratification by defendant of the drilling operations conducted by plaintiff on the whole property. The acquisition of the property jointly as a whole, and the drilling of wells by plaintiff on all of the leases, the benefits of which were availed of by defendant, must be considered as a single enterprise, jointly engaged in by the parties."

In the case of Ruffners v. Lewis' Ex'rs (Va.) 7 Leigh, 720, 30 Am. Dec. it was said:

"Where tenants in common have occupied the common property to the exclusion of a cotenant, they are entitled, in an accounting for the rents and profits, not only to a credit for their expenses and services actually rendered in operations upon the common property, which have made it of great value, but also for expenses, and for labor and services rendered in endeavoring to make it valuable, though unsuccessfully; they have acted bona fide, and only with a view of increasing the value of the property."

And also that:

"I am clearly of opinion that the defendants were not only fairly entitled to a credit for their expenses and actual services (not their invention and talent in contriving the machinery, etc.) in the successful operation which terminated in rendering the property of great value, but also for their expenses, labor. and services in their unsuccessful experiments. The plaintiffs, if they will have advantage from their successes, must be content to share in their disappointments and failures. He who takes the profit must share the burden. Their works were prosecuted under the impression that the property was their own. Their bona fides, therefore, cannot be doubted. They cannot be suspected of reckless expenditure, or of wild and extravagant adventures. They appear to have been as prudent and sagacious, as zealous and persevering. The plaintiffs are now to have the benefit of the labors of their lives, the fruits of their sagacity, and the harvest of their untiring energy and perseverance. They cannot therefore reasonably object to share in their outlay. For many a sleepless night and anxious day the defendants must still expect to go unpaid, for these admit not of estimate. But what they have expended in the bona fide pursuit of their great and meritorious object ought to be unstintingly repaid."

In this case a number of wells were drilled upon the premises in question, and the Mid-Continent Petroleum Corporation appears to have been diligent in both development and production. While this particular well was not profitable, the rest of the wells drilled upon the premises were. The drilling of an unprofitable well is a part of the hazard of production, and the drilling of this particular well was a part of the entire scheme of development of the lease as a whole. If the plaintiff is to share in the profits of the venture taken as a whole, it is only fair that the unprofitable portion thereof be made a proper and legitimate charge against the market value of the oil and gas produced. The trial court was in error in determining that the cost of this unprofitable well was not a part of the proper and necessary cost of development. Accordingly, that item will be stricken from the judgment.

Items 5, 6, and 7 of the judgment relate to casinghead gas and may be treated collectively. Prior to April of 1926, the casinghead gas produced by the Mid-Continent was not utilized. During that month the Mid-Continent completed the erection of a casinghead gasoline plant.

For the purpose of erecting this plant, that corporation had previously procured a surface lease from the owners of the premises. Shortly after the completion of this plant, a dispute occurred between Wagner and his associates and the Mid-Continent Petroleum Corporation as to the basis of accounting for the casinghead gas. The Mid-Continent endeavored to make a contract with Wagner for his portion of casinghead gas. The parties were unable to agree. Wagner and his associates demanded a share of the finished product of the plant proportionate to their interest in the premises. The Mid-Continent advised Wagner and his associates that their portion of the gas would be turned into the air. Neither of the parties to the controversy was right in its position.

Wagner and his associates were entitled to market value of gas produced less the cost of production, but they were not entitled to have their proportionate share of the raw product converted into gasoline at the expense of the Mid-Continent Petroleum Corporation. On the other hand, the Mid-Continent Petroleum Corporation was not entitled to turn the portion of the gas belonging to Wagner and his associates into the air. If this were permissible in cases of a disagreement, an extremely inequitable situation could exist between cotenants. A tenant in common owning a small fractional interest may choose not to develop the premises by reason of having no facilities with which to handle the oil or gas that he may have produced from the same. The size of this fractional interest may render it impractical for him to incur the expense necessary for him to take care of the product when produced. If the producing cotenant can separate the proportionate share of the oil and gas belonging to the nonconsenting cotenant and turn it loose at the mouth of the well, the nonconsenting cotenant who owns a small fractional interest will be compelled to assume the burden which it was his right to refuse to assume, or failing to do so, suffer the loss of his proportionate share of the proceeds of the production. Fairness between the parties and a recognition of their various rights demand that the producing cotenants who enter upon the premises for the purpose of production, without the consent of nonconsenting cotenant, and who take from the land oil and gas which becomes their future property, must exercise the same diligence with reference to the preservation and marketing of the shares belonging to the nonconsenting cotenant that is employed in connection with his own portion of the oil and gas. We so hold. Item No. 5 of this judgment, in the sum of $1,014.48, which represents 7/8 of 2/33 of the gas actually taken by the Mid-Continent in their plant, is therefore approved.

Item No. 6 appears to have been erroneously included within the judgment and is a duplicate of item No. 5 and will for that reason be stricken from the judgment.

The seventh item, for $647.45, represents 7/8 of 2/33 of the casinghead gas turned into the air. It is the contention of the Mid-Continent Petroleum Corporation that practically all of this represents an excessive amount which the capacity of the plant would not permit them to utilize. They say that, regardless of whether it was gas of Wagner and his associates or of the Mid-Continent Petroleum Corporation, there is no duty to account for the same for the reason that there was no available market. If this gas had no market value, this position would be sound. While the evidence on this point is not entirely satisfactory and there is some conflict therein, yet conflicting inferences may be drawn therefrom. We must presume in support of the finding of the trial court that it was determined that such gas had a market value. We cannot say that such finding is against the clear weight of the evidence, and the judgment on that item will be sustained. It is also contended by the defendants that a credit should have been allowed upon the judgment in the sum of approximately $500 for interest calculated upon the value of the supplies furnished by the Mid-Continent from the time of the furnishing of such supplies. In connection with this claim for credit on the judgment, it is pointed out by the defendants that this contention is first made to this court on appeal; that it was not presented to the trial court, was not included in the account which they rendered in the trial court, and that it was not mentioned in the motion for a new trial or the petition in error. In view of these facts, we do not deem the matter properly before the court for determination. In accordance with the foregoing view, the aggregate judgment of the trial court on the several items above considered will be reduced from $23,289.75 to $17,345.74.

We will next consider that portion of the judgment of the trial court awarding plaintiffs $5,000 as exemplary or punitive damages. The defendants urge that punitive damages cannot properly be allowed in the absence of an award of actual damages or a showing that a willful and malicious act was committed for which the law authorizes punitive damages by way of punishment. Plaintiffs in the second cause of action seek punitive damages, asserting as the basis of their right to the same: (1) The filing of an affidavit in the office of the county clerk of Lincoln county in which a lien was claimed upon the leasehold of the plaintiff; (2) that the defendants committed a willful trespass by entering upon the premises. With reference to the last contention, we have already determined that the Mid-Continent was not a trespasser, but, on the contrary, had a right to enter upon its lease under its lease for the purpose of development and production. (More will be said on this point in the subsequent portion of this opinion.) With reference to the filing of the affidavit in the office of the county clerk of Lincoln county, the record discloses that the defendant Mid-Continent Petroleum Corporation caused such an affidavit to be filed of record claiming a lien upon the lease-

hold of the plaintiff for expenditures in connection with production and development upon the premises. Our attention is not called to any statutes of this state authorizing the filing of such a lien claim in the office of the county clerk, nor does any such statute seem to exist. The general law governing classes of instruments affecting the title to real estate which are entitled to be recorded is set forth in sections 5251-5252 and 5254, C. O. S. 1921, and also 5253, C. O. S. 1921 [O. S. 1931, secs. 9672, 9673, 9675], as amended by chapter 172, Session Laws 1923 [O. S. 1931, secs. 11811-11819]. These statutory provisions authorize the recording of conveyances affecting the title of real estate, inclusive of mortgages and deeds of trust, and the filing and recording of affidavits or instruments in explanation of such conveyances. Lawful authority, however, is not given for the filing of ex parte affidavits by third persons claiming or asserting interest adverse to the title shown by the record. Persons having such claims against property should present them to a proper tribunal for adjudication. Ex parte affidavits of this character are not entitled to record in the absence of a special statute authorizing them to be filed, such as is true in connection with certain liens.

While we recognize that the practice of filing such affidavits should be condemned by the courts, we cannot approve a judgment for punitive damages in this case based upon the filing of such affidavit, for the reason that no actual damages were determined by the trial court to have resulted therefrom. As was said in the case of Western Union Telegraph Co. v. Garrett, 59 Okla. 50, 158 P. 619:

"We think it necessary also to call the trial court's attention to our view, that plaintiff cannot recover exemplary damages unless he shows first his right to recover actual damages."

Plaintiffs urge that the items of punitive damages might be sustained by reason of the defendants' acts of turning casinghead gas into the air. In order to justify exemplary or punitive damages, the acts complained of must be malicious, oppressive, or fraudulent, within the meaning of section 5975, C. O. S. 1921 [O. S. 1931, sec. 9962], which reads:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury in addition to the actual damages may give damages for the sake of example, and by way of punishing the defendant."

Gas turned into the air by the defendants was apparently released either (a) under the mistaken belief that they had a right to release the same, (b) or because it was in excess of the capacity of defendants' plant and no market was available for the same.

The trial court in awarding recovery for the amount thus disposed of found against the defendants on the last proposition. However, it is apparent in the light of all the circumstances in this case that the releasing of a portion of the casinghead gas was neither malicious, fraudulent, nor oppressive.

Plaintiffs also urge that the act of the defendant's attorney in giving free advice to Claude Russell Earp, which caused him to bring suit to quiet title against their lease, justified an award for exemplary damages. No actual damages were awarded by reason of this advice having been given, nor were any requested during the trial of this case, and for that reason an award for punitive damages based thereon could not have been rendered. Neither do we think that this would constitute the basis of a claim for actual damages. Whether justified or not, the act was one of strategy which we neither condemn nor approve. For reasons given, the judgment for exemplary damages will be vacated.

The defendants urge the court erred in rendering judgment against the defendants G. O. Moody, G. W. Showalter, and C. C. Crockett. These defendants were agents and servants of the Mid-Continent Petroleum Corporation and participated in this action. Plaintiffs contend that such judgment was proper in this case on the theory that the act of the defendants in entering upon the premises and producing therefrom was wrongful. They say in their brief:

"We are certain that the wrongs complained of were committed by the individuals, and the Mid-Continent Petroleum Corporation is liable because of the rule of respondeat superior. Obviously they are guilty even though their principal adopted and ratified the wrong."

This argument might be sound if the liability of the defendants arose out of a tort. Many of the old cases indicate that

entry by one tenant in common without the consent of a cotenant is a trespass and tortious in its nature, but that theory has been repudiated in more recent cases on oil and gas dealing with the rights of cotenants. In the case of Howard v. Manning, 79 Okla. 165, 192 P. 358, this court used language indicating that entry by a lessee as a cotenant was a trespass. That language was criticised, explained, and modified in the case of the Prairie Oil & Gas Co. v. Allen, supra. The criticism of the federal court was approved by this court in the case of Riddle v. Ellis, 139 Okla. 68, 281 P. 286.

The right of recovery of Wagner and his associates is not properly based upon the theory that the Mid-Continent was a trespasser. To so hold would be utterly inconsistent with a long line of cases holding that entry and production by a cotenant is rightful. Wagner's right to recover is based rather upon the relationship of tenancy in common and is a recognition of the fact that one tenant in common of oil and gas rights cannot enjoy his right to use the premises without effecting the value of the use thereof by the other cotenants. While recognizing the right of one cotenant to enter, drill, and produce oil and gas, the law imposes a corresponding burden on him to account to other cotenants for their proportionate share thereof. Prairie Oil & Gas Co. v. Allen, supra. Since the right of Wagner and his associates to recover is not based on a tort, it follows that the judgment against the agents and servants of the Mid-Continent Petroleum Corporation for $5,000 exemplary damages was improperly rendered.

The judgment of the trial court is, therefore, reversed as to the defendants G. O. Moody, G. W. Showalter, and C. C. Crockett. The judgment against the Mid-Continent is reduced to $17,345.74, with interest thereon at the rate of six per cent. per annum from May 14, 1930, and as so reduced is affirmed.

CULLISON, V. C. J., and SWINDALL, McNEILL, and BAYLESS, JJ., concur. RILEY, C. J., and OSBORN, J., dissent. ANDREWS, J., disqualified. WELCH, J., absent.