Robert G. ANDERSON, Elizabeth G. Anderson, Commonwealth Royalties, Inc., Joseph F. Mueller, Agent for Joseph Fred Muller, Jr., Catherine Elizabeth Mueller, Virginia Marie Mueller and Ann Worden Mueller, Appellants,

v.

DYCO PETROLEUM CORPORATION, El Paso Natural Gas Company and Panhandle Eastern Pipe Line Company, Appellees.

No. 61637.

Supreme Court of Oklahoma.

Oct. 10, 1989.

Ira L. Edwards, Jr., Houston and Klein, Inc., Tulsa, and James M. Tisdale, Cornell, Wright & Tisdale, Clinton, for appellants.

Burck Bailey, Eric S. Eissenstat, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, for appellee Panhandle Eastern Pipe Line Co.

James M. Gaitis, Emery McCandles & Gaitis, P.C., Oklahoma City, for appellee El Paso Natural Gas Co.

LAVENDER, Justice:

This appeal arises from a grant of summary judgment in favor of Appellee, Panhandle Eastern Pipe Line Company, one of three defendants sued by Appellants, a group of working interest owners in the Yowell No. 1–26 natural gas well located in Roger Mills County. Panhandle is an interstate pipeline company that purchases natural gas and transports it through a pipeline system in interstate commerce. Other defendants in the trial court were El Paso Natural Gas Company and Dyco Petroleum

Corporation.[1] Appellants alleged in their petition that Panhandle and El Paso were purchasing natural gas from the Yowell No. 1–26 well from Dyco (alleged to be the owner of approximately 47% of the working interest) and other working interest owners. The gist of Appellant's three causes of action was that they are entitled to be paid in proportion to their respective working interests in the well for the gas purchased by Panhandle and El Paso, but that none of the defendants paid them. The first cause alleged by Appellants sounded in tort for conversion of their respective proportionate share of gas. The second was for violation of certain Oklahoma statutes referred to by the parties as "ratable" take statutes. Appellants assert such provisions require Panhandle and El Paso to take gas from all working interest owners in proportion to their respective interests and pay for it accordingly.[2] The third cause was brought pursuant to 52 O.S. Supp.1983, §§ 541–547 which would allow working interest owners in a well the opportunity to ratify any agreement to sell gas entered into by another working interest owner and a purchaser under certain guidelines and to be paid in proportion to their interest. Appellants asserted that Dyco would not allow them to ratify the agreements it and other working interest owners had with El Paso and Panhandle and that none of the defendants had paid them in proportion to their interests in the well.

. After filing an answer to the petition Panhandle submitted a motion for summary judgment arguing the trial court lacked subject matter jurisdiction over the causes of action. It took the position that neither the legislative *or judicial* power of the State of Oklahoma could be invoked, whether by statute, Oklahoma Corporation Commission regulation *or court action*, to require an interstate pipeline company to purchase gas from any particular producer because via the Supremacy Clause to the United States Constitution (U.S. CONST. art VI, cl. 2) all such state authority was preempted by the operation of two related federal statutory schemes, the Natural Gas Act, 15 U.S.C. §§ 717 et seq. and the Natural Gas Policy Act, 15 U.S.C. §§ 3301 et seq. In essence, Panhandle argues the United States Constitution would be violated if Appellants were allowed to recover under either their conversion or statutory claims and to the extent the state statutes relied on by Appellants provide a viable

---

1. Only Panhandle filed for and was granted summary judgment by the trial court. El Paso has, however, filed a brief in this Court generally supporting the position of Panhandle, although it indicates our review of the federal preemption issue upon which Panhandle prevailed in the trial court, as said issue relates to Appellants' second cause of action, should be limited to a determination of only whether the application of 52 O.S.1981 §§ 23, 240 and, possibly, § 233 have been preempted. Panhandle and Appellants make arguments that the applicability of 52 O.S.1981 §§ 24–24.1 (Appellants) and 52 O.S.1981 § 239 (Appellants and Panhandle) are also involved. El Paso argues that § 24–24.1 should not be construed by us because they are not relevant in light of the underlying facts involved in the instant controversy. It asserts said provisions only involve situations concerning common carriers and the duty to *transport* natural gas without discrimination in favor of one producer over another or common source of supply over another, rather than any duty of a pipeline company to *purchase* ratably or without discrimination in favor of one producer or common source of supply. It asserts Appellants here are not requesting that either El Paso or Panhandle merely *transport* their gas to another willing buyer, but that they *purchase and pay* for it. It further argues § 239 only applies to producers of natural gas (i.e. Dyco and other working interest owners in the well) and not to purchasers like it and Panhandle. For the full text of §§ 23, 24 and 24.1 see notes 19, 20 and 21 *infra*, respectively. For § 233 see note 22, *infra*. For the text of §§ 239–240 see note 24, *infra*. Although the record does not definitively so disclose El Paso has informed us in its appellate brief that it, like Panhandle, is an interstate pipeline company.

2. Appellants first and second causes of action appear to be alternative inconsistent theories for recovery. The first cause of action for conversion is essentially based on the theory that gas being taken by Dyco (and other working interest owners) and sold to Panhandle and El Paso was, in part, Appellants' gas in proportion to their respective working interests. The second cause of action is that defendants refused to *take* Appellants' proportionate share and pay them for it. However, except for a prayer for punitive damages in the conversion claim the same amount of monetary relief was prayed for in both the first and second causes of action.

avenue under state law to allow such a result they are unconstitutional.

Submitted with Panhandle's motion was an affidavit from their in-house counsel. The affidavit set forth its position as a natural gas company and owner/operator of a pipeline system that purchases gas from producers, transports it in interstate commerce and sells it to various concerns along the pipeline. The affidavit indicated that any requirement to purchase uncommitted interests in wells connected to its pipelines would affect the overall price mix of all gas it purchased. It argued that because it was under certain contractual obligations, commonly referred to as "take or pay", to either accept delivery of contract quantities of gas from producers or pay producers for any deficiency in receipt of deliveries below the contract quantities, if it was required to purchase additional gas from working interest owners in positions like Appellants (i.e. those without contracts with Panhandle) or to pay them in proportion to their working interests for gas purchased under these contracts, these "take or pay" provisions might be activated because additional gas was not needed to supply the demand of its customers.[3]

In support of its preemption argument Panhandle places heavy reliance on two United States Supreme Court cases it says are dispositive of the instant controversy. These cases are *Northern Natural Gas Co. v. State Corporation Commission of Kansas*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed. 2d 601 (1963) and *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). The two cases held that state regulations requiring interstate purchasers like Panhandle to take or purchase gas ratably from producers are preempted by federal regulatory power over interstate pipelines' costs and purchasing patterns exercised by the Federal Energy Regulatory Commission or FERC. *Northern Natural* was decided under the provisions of the Natural Gas Act of 1938 which empowered the Federal Power Commission (FERC's predecessor) to set price ceilings for sales from producers to pipelines and to regulate the prices pipelines could charge their downstream customers. *Transcontinental* involved a determination of whether the ruling of *Northern Natural* survived passage of the Natural Gas Policy Act of 1978 which removed some of the federal controls contained in the Natural Gas Act and to a greater extent left the field of buying and selling natural gas to the market forces of supply and demand.[4] In the present case Panhandle argues that to subject it to lawsuits and potential liability, either monetary or in the form of requiring it to purchase gas from producers with which it has no contractual obligation, puts it in the same situation as that of the pipeline companies involved in *Northern Natural* and *Transcontinental* and, thus, Appellants' causes of action are likewise preempted. The trial court agreed and granted summary judgment in favor of Panhandle on the basis it lacked subject matter jurisdiction over the causes of action as they were preempted by these federal Acts and the

---

**3.** A discussion of "take or pay" clauses can be found in the case of *Golsen v. ONG Western, Inc.* 756 P.2d 1209 (Okla.1988).

**4.** Recently, in a unanimous decision the United States Supreme Court clarified the import of *Northern Natural* and *Transcontinental*. In *Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas*, 489 U.S. ——, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989) it ruled that a regulation which governed the timing of natural gas production mainly in the form of permanent cancellation of a producers' rights to extract assigned or allocated quantities of gas from the Hugoton field if production was delayed beyond specified time periods was not preempted and further did not violate the Com-

merce Clause of the United States Constitution, U.S. Const. Art. I, § 8, cl. 3. On the preemption issue it determined that although a state could regulate rates of production in aid of conservation goals and the protection of producers' correlative rights under authority expressly reserved to it under the Natural Gas Act to regulate the "production or gathering" of natural gas (15 U.C.C. § 717(b), even though the regulation at issue might affect gas purchasers' costs and interstate rates. It distinguished *Northern Natural* and *Transcontinental* where the regulations or provisions were aimed directly at a pipelines' purchasing decisions although in the guise of regulating production.

force of the Supremacy Clause to the United States Constitution.

■ We have determined that it would be improper for us to reach any of the constitutional issues raised by the parties because a ruling on any such issue is unnecessary to properly resolve the merits of this controversy.[5] This is so for the reason the record discloses Appellants have no claim against Panhandle as alleged in their first cause of action under the common law of the State of Oklahoma. As well, Appellants have no viable claim under the "ratable" take statutes relied on because those statutes that do apply to regulate gas purchasing do not apply to mandate nondiscrimination on the part of natural gas purchasers in relation to their purchasing practices between working interest owners in a single well, but only to situations where multiple wells are involved in a common source of supply or between sources of supply. In addition, other statutes relied on do not apply to purchasing practices at all, but only to the transportation of natural gas or its production. Finally, although 52 O.S.Supp.1983, §§ 541–547 is applicable to situations involving a single well, Appellants have abandoned or waived error in regard to the trial court's ruling in relation to that statutory scheme because they have failed to present any argument or authority in their briefs submitted to this Court based on said provisions.[6]

## OKLAHOMA LAW DOES NOT RECOGNIZE A CLAIM FOR CONVERSION ON THE FACTS REVEALED BY THE INSTANT RECORD

In relation to Panhandle's motion for summary judgment, the record in this case reveals that Appellants, along with Dyco and others, own various percentages of the working interest in the Yowell No. 1–26 natural gas well. It also reveals Panhandle has been purchasing gas from the well from Dyco and other working interest owners and paying these working interest owners for the gas purchased, while Appellants have not received any of the proceeds from the sales. Appellants allege such in their petition and these allegations are confirmed in the affidavit of one of Appellants which was submitted to the trial court in response to Panhandle's motion for summary judgment. The record further reveals Appellants are not parties to the agreement Dyco has with Panhandle for the sale of natural gas. This is confirmed by Appellants petition and the same affidavit by the assertion that Dyco refuses to allow them to ratify its agreement with either Panhandle and/or El Paso. It is our view that as to the above material facts there is no genuine dispute and Panhandle was and is entitled to judgment in its favor as a matter of law. As will be explained, in these circumstances, Oklahoma law provides no tortious action for conversion in favor of working interest owners like Appellants against a purchaser of natural gas who buys gas from one or more other working interest owners in the same well.

■ Under Oklahoma law Appellants and the other working interest owners in the well are tenants in common.[7] As cotenants each is entitled to market production from the well and the sale of gas to a purchaser by one or more cotenants without consent of other cotenants is lawful. Under ordinary circumstances it does not involve tortious conduct, i.e. conversion, on the part of either the purchaser or on the part of the working interest seller because

---

**5.** Courts will not determine the constitutionality of statutes or decide constitutional issues when unnecessary to a determination of the merits of a controversy. *Ranola Oil Co. v. Corporation Commission of Oklahoma*, 752 P.2d 1116, 1118 (Okla.1988); *Schwartz v. Diehl*, 568 P.2d 280, 283 (Okla.1977); *In Re Mayes–Rogers Counties Conservancy District Formation*, 386 P.2d 150, 151 (Okla.1963).

**6.** The parties have also briefed issues related to whether the causes of action or statutes relied on by Appellants violate the Commerce Clause of the United States Constitution. Although we question whether this defense was raised by Panhandle in its motion for summary judgment or ruled on by the trial court, even if any Commerce Clause issue was otherwise properly before us our disposition of this case would be the same.

**7.** *Demik v. Cargill*, 485 P.2d 229, 231 (Okla. 1971).

each cotenant has the right to develop the property and market production under the common law.[8]

Recently in *Teel v. Public Service Company of Oklahoma,*[9] this Court outlined the limited circumstances under which a purchaser may be liable for conversion when purchasing natural gas from a well operator. This situation initially arises when the cotenants name another cotenant to exploit the cotenancy for their mutual profit by entering into an operating agreement amongst themselves to have the operator market or sell gas produced from the well.[10] It also requires that there be an absence of a division order.[11] Additionally, and most importantly for purposes of disposition of the instant case, *a purchaser must have notice that a working interest owner not a party to the division order has revoked the operator's right to sell his/her share of gas under the operating agreement and the purchaser must continue to treat the situation as if it is purchasing the nonconsenting cotenant's share of gas, while failing to account to each working interest owner for his/her pro rata share of the proceeds.*[12] The *Teel* situation only comes into play when a purchaser purports to buy gas of an owner from an operator which is not authorized to deliver it.[13]

▮ Our situation is virtually the opposite of that faced in *Teel.* In *Teel* the working interest owner, by revoking the operating agreement, expressed an intent not to have the operator sell or the purchasers buy his gas. The purchasers, contrary to such intention, continued to treat the situation after revocation as if they were still purchasing gas from a working interest owner *that did not want to sell it to them.* In contrast Appellants here take the position that anytime one cotenant sells gas to a purchaser, which as noted above the cotenant has a lawful right to do, the purchaser becomes liable to each and every other working interest owner for conversion simply by the force of the working interest owner's *desire to sell his gas and be paid in proportion to his percentage of working interest in the well, even though not a party to any purchase contract.* We find no authority for this result under the common law of Oklahoma and we reiterate the admonition in *Teel* itself contained in the first footnote thereof, that, "[i]nsofar as *Teel* announces a rule of conversion, it is confined to the pecular scenario found [therein]."[14] Further, as *Teel* notes, "[a] gas sales contract executed by a cotenant is limited to his/her interest"[15] and we see nothing in the facts of this case that would indicate gas purchased by Panhandle under agreement with Dyco, on behalf of itself or itself and some of the other working interest owners, would constitute either a wrongful sale or purchase of Appellants' interest as was the case in *Teel.*[16]

---

8. *Moody v. Wagner,* 167 Okla. 99, 23 P.2d 633, 639 (Okla.1933). *Mullins v. Ward,* 712 P.2d 55, 62–63 (Okla.1985).

9. 767 P.2d 391 (Okla.1985).

10. *Id.* at 396.

11. *Teel* defines a division order as "[A]n agreement between the working interests and the purchasers which provides a formula for payment of the purchasers' price of gas." *Id.* at 397.

12. *Id.* at 397–398.

13. *Id.* at 398. Of course, a conversion may also occur when a purchaser buys gas from someone who has *no* authority to sell gas from the well, such as where a trespasser produces under an invalid oil and gas lease. *See e.g. Probst v. Bearman,* 76 Okla. 71, 183 P. 886 (Okla.1919).

14. *Teel v. Public Service Company of Oklahoma,* supra note 9, 767 P.2d at 393.

15. *Id.* at 396.

16. Although Appellants' briefs submitted to this Court assert there are "many" factual issues which preclude a grant of summary judgment in favor of Panhandle they specify only one purported "factual" issue related to their conversion claim. They assert Panhandle itself creates an issue by a statement contained in its appellate response brief. The statement is as follows: "Panhandle averred that it had no gas purchase contract with [Appellants] and had taken none of [their] gas. Panhandle denied that it was converting [Appellants'] gas." If by this argument Appellants mean to say there is a material factual issue subject to genuine dispute as to whether Appellants *do* have a gas purchase contract with Panhandle, such is conclusively refuted by Appellants' own petition and affidavit

Therefore, on the instant record Appellants have no claim against Panhandle for conversion of their respective percentages of working interest in the Yowell No. 1–26 natural gas well.

■ Such a disposition does not leave working interest owners like Appellants without a remedy. The law has been settled for some time that a producing cotenant must account to a non-producing cotenant for the market value of the production less any reasonable and necessary expenses of developing, extracting and marketing.[17] Further, certain practices of the industry have been acknowledged by the courts to remedy situations like that apparently existent here where only certain working interest owners have sold production. These practices involve balancing in kind the production from the well by allowing cotenants like Appellants the opportunity to market gas from the well (i.e. taking a certain percentage of an overproduced party's gas until any imbalance in the cotenant's takes from the well are made up), by periodic cash balancing whereby underproduced cotenants receive cash from producing cotenants in proportion to their respective interests and cash balancing upon any particular gas reservoir's depletion.[18] Instead of bringing an action for account-

ing or relying on one of the potential solutions set forth above, Appellants sought instead to turn what should have been largely an equitable proceeding into a tortious one not sanctioned by Oklahoma law. Accordingly, although not for the reason of federal preemption relied on by the trial court, we affirm the grant of summary judgment in favor of Panhandle because Appellants have no cause of action for conversion against it under the material facts revealed by the record.

## THE STATUTES RELIED ON BY APPELLANTS TO SHOW PANHANDLE IS REQUIRED TO PURCHASE GAS IN PROPORTION TO EACH OWNERS INTEREST EITHER DO NOT APPLY TO SITUATIONS INVOLVING ONE WELL OR TO PURCHASING AT ALL BUT TO TRANSPORTATION OR PRODUCTION OF GAS

In their second cause Appellants assert certain Oklahoma statutes require Panhandle to take gas from the involved well ratably, a term they assert means, in proportion to each working interest owner's respective ownership interest. The first statute relied on by Appellants is 52 O.S. 1981, § 23.[19] Section 23, in relevant part,

which indicate Dyco has refused to allow them to ratify its sales contract with Panhandle. Appellants have nowhere alleged they are parties to this agreement or that they have a separate agreement with Panhandle. Furthermore, although when setting forth their various percentages of working interest ownership in both their petition and affidavit they assert they "own a net revenue interest in the gas produced" from the well in proportion to their working interest, we read such assertion as nothing more than an exhibition of Appellants' incorrect view of Oklahoma common law that the tort of conversion occurs when one or more cotenants rightfully markets production of a well under a contract with a purchaser when other cotenants are not parties to the contract. Where Appellants miss the mark is in viewing such sales as wrongful or tortious when they are not paid by the purchaser, rather than as a lawful exercise of the rights of a tenant in common as set forth in the text above.

17. *Earp v. Mid–Continent Petroleum Corp.,* 167 Okla. 86, 27 P.2d 855, 858 (Okla.1933); *Essley v. Mershon,* 262 P.2d 417, 420 (Okla.1953).

18. *United Petroleum Exploration v. Premier Resources,* 511 F.Supp. 127, 130–131 (W.D.Okla. 1980); *Beren v. Harper Oil Company,* 546 P.2d 1356 (Okla.App.1975). On the instant record we have no reason to and do not express any view as to which method of balancing might be appropriate in this case.

19. 52 O.S.1981, § 23 provides:
Every corporation, joint stock company, limited copartnership, partnership or other person, now or hereafter claiming or exercising the right to carry or transport natural gas by pipe line or pipe lines, for hire, compensation, or otherwise, within the limits of this state, is allowed by, and upon compliance with the requirements of this act, as owner, lessee, licensee, or by virtue of any other right, or claim, which is now engaged or hereafter shall engage in the business of purchasing natural gas shall be a common purchaser thereof, and shall purchase all the natural gas in the vicinity of, or which may be reasonably reached by its pipe lines, or gathering branches, without discrimination in favor of one producer or one person as against another, and shall fully perform all

makes pipeline companies engaged in the business of purchasing gas common purchasers and requires them to purchase all gas offered for sale in the vicinity of or that may reasonably be reached by its gathering lines without discrimination in favor of one producer or person over another and that if a purchaser is unable to do so it must purchase from each person or producer ratably, in proportion to the average production. It also provides that a purchaser cannot discriminate in favor of its own production or production in which it is interested, directly or indirectly, in whole or in part. Another provision relied on is 52 O.S.1981, § 24.[20] Section 24 makes pipeline companies common carriers and prohibits unlawful discrimination in favor of the carriage, transportation or delivery of any natural gas offered to it, in its possession or control, or in which it may be interested, directly or indirectly. Both of these provisions are a part of the Production and Transportation Act of 1913 which is found at 52 O.S.1981, § 21 et seq., as amended. Another provision added to the Oklahoma statutes in 1978 and relied on by Appellants is 52 O.S.1981, § 24.1.[21] It provides anyone aggrieved by a common carrier's refusal to purchase or transport gas may file a complaint with the Oklahoma Corporation Commission (OCC) and that OCC has authority to order purchase or transport, including the fixing of a fair rate for any transportation.

The next provision relied on is 52 O.S. 1981, § 233,[22] a part of an act passed in 1913 for the express purpose of defining

20. 52 O.S.1981, § 24 provides:
Every corporation, joint stock company, limited co-partnership, partnership or other person, now or hereafter engaged in the business of carrying or transporting natural gas for hire, for compensation or otherwise, by pipe line, or pipe lines within this State, and by virtue of and in conformity to, any valid law incapable of revocation by any law of this State or of the United States, or by virtue of and in conformity to the provisions of this act, shall be a common carrier

the duties of a common purchaser; but if it shall be unable to perform the same, or be legally excused from purchasing and transporting all the natural gas produced or offered, then it shall purchase and transport natural gas from each person or producer ratably, in proportion to the average production, and such common purchasers are hereby expressly prohibited from discriminating in price or amount for like grades of natural gas or facilities as between producers or persons; and in the event it is likewise a producer, it is hereby prohibited from discrimination in favor of its own production, or production in which it may be interested directly or indirectly in whole or in part, and its own production shall be treated as that of any other person or producer. All persons, firms, associations, and corporations are exempted from the provisions of this act, except from the provisions of section (9) nine hereof, where the nature and extent of their business is such that the public needs no use in the same, and the conduct of the same is not a matter of public consequence, and for this purpose the district courts of the state and the Corporation Commission are hereby vested with jurisdiction to determine such exemptions in any action or proceeding properly before them, and provided by the laws now in force in this state regulating the purchase and transportation of oil.

thereof as at common law, and no such common carrier shall allow or be guilty of any unjust or any unlawful discrimination, directly or indirectly, in favor of the carriage, transportation or delivery of any natural gas, offered to it, in its possession or control, or in which it may be interested, directly or indirectly, and, provided further, that any person, firm or corporation owning or operating a gas pipe line within the limits of any incorporated city or town in this State shall be exempted from the provisions of this section only as to its distributing lines located wholly within the corporate limits of said city or town.

21. 52 O.S.1981, § 24.1 provides:
Any person, firm or municipality aggrieved by reason of the refusal by a common carrier of natural gas to purchase or transport natural gas produced by such person or firm or gas production owned by said municipality may file a complaint before the Corporation Commission. The Corporation Commission shall conduct a hearing and take evidence as is necessary to determine the complaint. Notice shall be given to the common carrier at least ten (10) days prior to such hearing. The Corporation Commission shall order the common carrier to purchase or transport the natural gas, and fix a fair rate for such transportation, unless the common carrier establishes and the Commission determines that:
1. Such natural gas cannot reasonably be carried by the named common carrier, because of the difficulty or expense involved;
2. Some other common carrier of natural gas can more conveniently purchase or transport such natural gas; or
3. The gas might dilute or pollute the gas being carried in their line.

22. 52 O.S.1981, § 233 provides:

ownership in gas and restricting the output thereof. Such act is found at 52 O.S.1981, §§ 231–235.[23] Section 233, with certain exceptions, requires anyone taking gas from a gas field to take ratably from each owner of the gas in proportion to his interest, upon such terms as may be agreed on by the owner and the party taking the gas. It further provides if the parties cannot agree to terms OCC may fix a price for the gas and other terms of the taking after notice and hearing.

The final provisions relied on are 52 O.S. 1981, §§ 239–240[24] two sections of the Oklahoma Natural Gas Act of 1915 found at 52 O.S.1981, §§ 236–247. Section 239 provides when full production from any common source of supply of natural gas in Oklahoma is in excess of market demand any person having the right to drill into and produce from any common source of supply may take from the source of supply only the proportion of natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by such person bears to the total natural flow of the common source of supply having due regard to the acreage drained by each well. It also gives OCC

---

Any person, firm or corporation, taking gas from a gas field, except for purposes of developing a gas or oil field, and operating oil wells, and for the purpose of his own domestic use, shall take ratably from each owner of the gas in proportion to his interest in said gas, upon such terms as may be agreed upon between said owners and the party taking such, or in case they cannot agree at such a price and upon such terms as may be fixed by the Corporation Commission after notice and hearing; provided, that each owner shall be required to deliver his gas to a common point of delivery on or adjacent to the surface overlying such gas.

**23.** For the provisions of the original enactment refer to 1913 Okla.Sess.Laws, ch. 198, pp. 439–441, §§ 1–5. Only section 232 has been amended since 1913.

**24.** 52 O.S.1981, § 239 provides:

Whenever the full production from any common source of supply of natural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom only such proportion of the natural gas that may be marketed without waste, as the natural flow of the well or wells owned or controlled by any such person, firm or corporation bears to the total natural flow of such common source of supply having due regard to the acreage drained by each well, so as to prevent any such person, firm or corporation securing any unfair proportion of the gas therefrom; provided, that the Corporation Commission may by proper order, permit the taking of a greater amount whenever it shall deem such taking reasonable or equitable. The said commission is authorized and directed to prescribe rules and regulations for the determination of the natural flow of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, and to prevent unreasonable discrimination in favor of any one such common source of supply as against another.

52 O.S.1981, § 240 provides:

Every person, firm or corporation, now or hereafter engaged in the business of purchasing and selling natural gas in this state, shall be a common purchaser thereof, and shall purchase all of the natural gas which may be offered for sale, and which may reasonably be reached by its trunk lines, or gathering lines without discrimination in favor of one producer as against another, or in favor of any one source of supply as against another save as authorized by the Corporation Commission after due notice and hearing; but if any such person, firm or corporation, shall be unable to purchase all the gas so offered, then it shall purchase natural gas from each producer ratably. It shall be unlawful for any such common purchaser to discriminate between like grades and pressures of natural gas, or in favor of its own production, or of production in which it may be directly or indirectly interested, either in whole or in part, but for the purpose of prorating the natural gas to be marketed, such production shall be treated in like manner as that of any other producer or person, and shall be taken only in the ratable proportion that such production bears to the total production available for marketing. The Corporation Commission shall have authority to make regulations for the delivery, metering and equitable purchasing and taking of all such gas and shall have authority to relieve any such common purchaser, after due notice and hearing, from the duty of purchasing gas of an inferior quality or grade.

Recently, the United States Court of Appeals for the Tenth Circuit held that § 240, and an Oklahoma Corporation Commission (OCC) rule (Rule 1–305) implementing it impermissibly interfered with federal regulation of the purchase of natural gas and that it was preempted by the Natural Gas Act and the Natural Gas Policy Act. *ANR Pipeline v. Corporation Commission of the State of Oklahoma,* 860 F.2d 1571 (10th Cir. 1988), cert. denied —— U.S. ——, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

power to promulgate regulations for determination of the natural flow of any such well or wells and to regulate the taking of natural gas from all common sources of supply in the State to prevent waste, to protect the public, to protect all having a right to produce and to prevent unreasonable discrimination in favor of one common source of supply against another.

Section 240 finally provides that anyone in the business of purchasing or selling natural gas in this State is a common purchaser and must purchase all the natural gas that may reasonably be reached by its trunk or gathering lines without discrimination in favor of one producer as against another or in favor of one common source of supply against another. It further provides if such a purchaser is unable to purchase all such gas it must purchase from each producer ratably, that it cannot discriminate in favor of its own production or production it is directly or indirectly interested, but for the purpose of prorating the natural gas to be marketed such production shall be taken only in the ratable proportion that such production bears to the total production available for marketing.

Initially, we note the primary goal of statutory construction is to ascertain the intent of the Legislature.[25] We also note that legislative enactments concerning the same subject matter should be construed together as a harmonious whole in order to give effect to each.[26]

In the case of *Seal v. Corporation Commission,*[27] which involved a challenge to the constitutionality of 52 O.S.Supp.1983, §§ 541–547, we had occasion to discuss said Act and its differences with earlier provisions in the area of natural gas law in Oklahoma, including the exact statutes relied on by Appellants.[28] One of the main differences we recognized was that the new enactment applied to co-owners in a single well as opposed to owners of interests between wells in a common source of supply.[29] This view was consistent with the manner in which the provisions relied on by Appellants had historically been interpreted. For example, in *Republic Natural Gas Company v. State,*[30] we utilized the statutory definition of the term ratable taking found at 52 O.S.1941, § 232 in affirming an order of OCC based on § 233 to the effect that one gas company had to either take gas ratably from another gas company's well or cease production from its own wells in a common source of supply. Section 232, of course, is part of the same Act which contains § 233. The definition utilized is as follows:

> [R]atable taking is defined as the proportion which the natural flow of gas from the wells of one producer bears to the amount of the natural flow from the wells of the owners producing from the same common source of supply or common reservoir.[31]

This definition does not and we conclude was never intended by the Legislature to reach situations involving purchasing pat-

---

**25.** *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Commission,* 764 P.2d 172, 179 (Okla.1988).

**26.** *Inexco Oil Company v. Corporation Commission,* 628 P.2d 362, 365 (Okla.1981); *Johnson v. Ward,* 541 P.2d 182, 186 (Okla.1975).

**27.** 725 P.2d 278 (Okla.1986).

**28.** *Id.* at 285–286.

**29.** *Id.* at 285. A common source of supply is defined by statute as follows:

(c) The term "Common Source of Supply" shall comprise and include that area which is underlaid or which, from geological or other scientific data, or from drilling operations, or other evidence, appears to be underlaid, by a

common accumulation of oil or gas or both; provided, that, if any such area is underlaid, or appears from geological or other scientific data, or from drilling operations, or other evidence, to be underlaid by more than one common accumulation of oil or gas or both, separated from each other by a strata of earth and not connected with each other, then such area, as to each said common accumulation of oil or gas or both, shall be deemed a separate common source of supply;

52 O.S.1981, § 86.1(c).

**30.** 198 Okla. 350, 180 P.2d 1009 (Okla.1947), *appeal dismissed* 334 U.S. 62, 68 S.Ct. 972, 92 L.Ed. 1212 (1948).

**31.** *Id.* at 1013–1014. *See also Anderson–Prichard Oil Corp. v. Corporation Commission,* 207 Okla. 686, 252 P.2d 450 (Okla.1953).

terns by purchasers of working interest owners' various percentages of ownership interest in a single well. Another provision of the Act is also inconsistent with a view which would apply the provisions of § 233 to a dispute involving gas purchasing patterns from a single well. 52 O.S.1981, § 234, in providing liability for damages and penalties for misappropriation of gas says anyone, "[T]aking more than his ... proportionate share of ... gas, in violation of the provisions of this act, shall be liable *to any adjoining well owner ...* ." Thus, it can be seen, both by the language utilized in the Act itself and by judicial interpretation of that language, the provisions of § 233 apply to owners of interest between wells in a common source of supply and not to purchasing patterns among co-owners in a single well.[32]

The same basic analysis applies to the statutory scheme we have referred to as the Natural Gas Act of 1915 [52 O.S.1981, §§ 236–247]. Section 239 of this Act contains substantially the same definition as that found in § 232 in regard to taking gas from a common source of supply and we noted in *Republic* that said provision, "[V]ested in [OCC] power to enforce ratable taking under the provisions of § 233...."[33] Thus, when § 240 of the Act refers to purchasers such as Panhandle, "purchas[ing] natural gas from each producer ratably" or in regard to its own production, or production it may be interested directly or indirectly, that said production shall be taken "[I]n the ratable proportion that such production bears to the total production available for marketing," we conclude the Legislature only intended proration of purchases between the various wells in a common source of supply or purchasing patterns between common sources of supply.[34]

Furthermore, § 239 by its express language does not apply to the *purchase* of gas, but to the production thereof and said provision places no duty on an entity that is strictly a purchaser. By its very terms it concerns those, "[H]aving the right to drill into and produce gas from any ... common source of supply...."[35] We find no support for the proposition that § 239, standing alone, would require a purchaser, rather than a producer to comply with its terms.

As to § 23 we also conclude said provision was never intended to mandate that a purchaser such as Panhandle purchase gas from a single well from all having an ownership interest in the well. We so indicated in *Seal v. Corporation Commission, supra* and we see no need at this time to retreat from such view. Such a view is consistent with previous cases either discussing or interpreting § 23 which have concerned situations involving multiple wells or entire gas fields.[36]

**32.** In light of our conclusion that § 233 does not apply to mandate ratable taking from the interest owners in a single well, we deem it unnecessary to determine whether said provision only applies to producers of natural gas or both producers *and* purchasers within a common source of supply.

**33.** 180 P.2d at 1016. It should also be noted that the Natural Gas Act of 1915 is further concerned with discrimination in favor of one common source of supply as against another and OCC was given authority by this Act to regulate the taking of all natural gas from all common sources of supply within the State. 52 O.S.1981, §§ 239–240. Sections 231–235 further differ from the Act of 1915 in that the former provisions were intended primarily to enforce ratable taking and protect correlative rights while the latter was primarily for the prevention of waste and to authorize OCC to enforce ratable taking, not only to prevent waste, but to protect the public and all having a right to produce from a common source of supply. *Id.* at 1014.

**34.** Such an interpretation is consistent with Rule 1–305 passed by OCC in 1983 to implement the provisions of § 240. Said rule is set forth in *ANR Pipeline v. Corporation Commission of the State of Oklahoma,* 860 F.2d at 1574–1575, n. 3, *supra* note 24. As set forth in note 24 *supra,* the United States Court of Appeals for the Tenth Circuit held said rule unconstitutional as preempted by federal law.

**35.** *See Golsen v. ONG Western, Inc.,* 756 P.2d at 1214–1215, *supra* note 3 and *ANR Pipeline v. Corporation Commission of the State of Oklahoma,* 860 F.2d at 1582, *supra* note 24.

**36.** *See e.g. Cities Service Gas Co. v. Peerless Oil & Gas Co.,* 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1951); *ONG v. White Oil Co.,* 312 P.2d 879 (Okla.1957).

■ Although the Oklahoma Legislature has promulgated provisions in regard to working interest owners that may limit their individualized ability to drill into a common source of supply by affording power to OCC to create drilling and spacing units and the power, when they cannot voluntarily agree, to order forced pooling of their interests and, thus, the sharing of costs and production from a producing well,[37] we conclude neither such provisions or the statutes relied on by Appellants in their second cause of action mandate that a purchaser such as Panhandle either take their proportionate share of gas from the involved well or pay them in proportion to their respective ownership interests therein.[38]

We are further of the view that § 24 by its plain and unambiguous language does not apply to require a gas purchaser such as Panhandle to purchase gas from the involved well. That statute is concerned with the carriage or transportation of natural gas and prohibits discrimination in such regard. Thus, even if it could be said that it applies to situations involving a single well, we conclude it would do no more than require a pipeline company to transport Appellants' gas to a willing buyer should they have one. Appellants' case is not one where they seek to have Panhandle transport their gas to a willing purchaser. They instead seek to have Panhandle purchase their gas. Although a company such as Panhandle may at the same time be both a common purchaser of gas under § 23 and a common carrier under § 24, we find no support for the proposition that all pipeline companies necessarily *must* be both common carriers *and* common purchasers. We recognized as much in *Inexco Oil Co. v.*

*Corporation Commission*,[39] a case construing §§ 23, 24 and 24.1, when we observed, "[A] corporation simultaneously may be a common purchaser and a common carrier." At a minimum, for a pipeline company to be a common purchaser under § 23 it must engage in the business of purchasing natural gas, as opposed to the mere carriage thereof. Therefore, § 24 provides Appellants no vehicle for recovery because that provision does not apply to afford the form of relief they seek in regard to their second cause of action.

The final section relied on by Appellants in support of their second cause is § 24.1. Although in *Inexco* we seemed to interpret § 24.1 as applying only to the transport of natural gas [40] we note that said provision also appears to impliedly mandate a company that would solely be characterized as a common carrier to purchase natural gas. We believe to the extent § 24.1 talks about the purchase of natural gas such language must be read in context with the preceding sections contained in the original 1913 Act, i.e. §§ 23–24. Read in such context it becomes evident § 24.1 does not mandate that an entity solely classified a common carrier is required to purchase gas, in addition to the transport thereof. Likewise, to the extent § 24.1 does require the purchase of gas we conclude such mandate is only in regard to those entities that would be classified common purchasers under § 23 and that any such mandated purchases do not apply to situations like the one at hand because as noted in *Seal* that statute applies to owners of interests between wells in a common source of supply, as opposed to interests of co-owners in a single well.

---

**37.** *See e.g. Ward v. Corporation Commission,* 501 P.2d 503 (Okla.1972); *Wood Oil Company v. Corporation Commission,* 268 P.2d 878 (Okla. 1954). For the current statutes on well spacing and drilling units refer to 52 O.S.Supp.1988, § 87.1 et seq.

**38.** As will be seen in the next section of this opinion we express no view as to the viability of a claim against a purchaser such as Panhandle pursuant to 52 O.S.Supp.1983, §§ 541–547, including the incorporation of 52 O.S.Supp.1985, § 540 therein. This is so for the reason Appellants have abandoned or waived reliance on

said provisions or error of the trial court in its ruling related to said statutory scheme by their failure to present argument or authority to this Court in said regard.

**39.** 628 P.2d at 365, note 26 *supra.*

**40.** *Id.* at 365. We also note that the title to 52 O.S.Supp.1978, §§ 24.1–24.2 references only the transport of natural gas and mentions nothing about purchase. 1978 Okla.Sess.Laws, ch. 100, pg. 184.

In that none of the provisions relied on by Appellants to support their second cause are applicable to give them a viable claim in light of the facts contained in the record, we affirm the ruling of the trial court for the reasons set forth above. As with our determination on Appellants' conversion claim our disposition does not require us to rule on the preemption question.

APPELLANTS HAVE WAIVED ANY CLAIM OF ERROR IN RELATION TO THE TRIAL COURT'S DISPOSITION OF THEIR THIRD CAUSE OF ACTION

■ When one comes before this Court challenging the determination of a trial court they are duty bound to set forth argument and authority supporting a claim of error as to the trial court's ruling.[41] Furthermore, a long-standing principle of this Court is that, "[a]ssignments of error which are not argued in the brief with citations of authority will be considered and treated as waived by this Court."[42] In the present appeal Appellants have totally failed to present any argument or any authority concerning the trial court's disposition of their third cause of action and for this reason we conclude they have waived any claim of error in regard thereto.

Appellants have presented two substantive appellate briefs to this Court, a brief in chief and a reply brief. In these submissions nowhere do Appellants expressly discuss that their trial court petition contained a third cause of action based on 52 O.S. Supp.1983, §§ 541–547. No discussion, at all, is set forth in either of the briefs concerning said statutory scheme. In fact, neither of the briefs contain one citation to these statutes. We, thus, have no occasion to construe §§ 541–547 in relation to the trial court's determination that Appellants' third cause against Panhandle, based on said provisions, was preempted by federal law because Appellants have waived error as to said ruling. Accordingly, the decision of the trial court is affirmed for the rea-

sons and in conformity with the views expressed in this opinion.

All the Justices concur.

---

**41.** *Peters v. Golden Oil Co.,* 600 P.2d 330, 331 (Okla.1979).

