1998 OK 69

Kent J. HARRELL, d/b/a Harrell Energy Co.; Anderman Oil Corporation; Ellen Anderman; Dona M. Mohan; Ralph H. Smith, d/b/a Sunrise Exploration; and St. Mary Parish Land Company, Appellees,

v.

SAMSON RESOURCES COMPANY, Charles Schusterman; Harold Josey Schusterman Irrevocable Trust dated May 3, 1977; Harold Josey Schusterman's Children's Irrevocable Trust dated May 3, 1997; Stacy H. Schusterman's Children's Irrevocable Trust dated May 3, 1997; Jerome R. Schusterman's Children's Irrevocable Trust dated May 3, 1997; and Ace Company IV, Appellants.

No. 82,139.

Supreme Court of Oklahoma.

July 7, 1998.

Rehearing Denied June 14, 1999.

James A. Kirk, Matthew L. Standard, Kirk & Chaney, Oklahoma City, Oklahoma, For Appellants.

James E. Poe, Emily D. Poe, Tulsa, Oklahoma; W. Bland Williamson, John L. Randolph, Jr., Pray, Walker, Jackman, Williamson & Marlar, Tulsa, Oklahoma, For Appellees.

HARGRAVE, J.

¶ 1 The issue to be determined is whether this gas balancing dispute should be resolved by allowing balancing in kind, pre-depletion cash balancing or cash balancing upon depletion. The trial court allowed pre-depletion gas balancing on the Deputy 21–1 well at the weighted average price received by defendants, and awarded prejudgment interest and attorney fees to the plaintiff.

¶ 2 Plaintiffs and defendants executed a joint operating agreement covering all of Section 21, Township 12 North, Range 16 West, Custer Co., Oklahoma, in which Conoco, Inc. (not a party to this suit) was designated as the Operator. Conoco owned 81.25% of the working interest, Plaintiffs own 12.5% interest and defendants own 6.25% interest. All of Section 21, Township 12 North, Range 16 West, constitutes a drilling and spacing unit established by the Oklahoma Corporation Commission on August 7, 1978 in Order No. 143939, for production from the Des Moinesian common source of supply. There is no Gas Balancing Agreement between the parties, and the question of whether the parties were marketing gas under the Sweetheart Gas Act has been removed as an issue.[1] It does not appear that the parties are common law tenants in common because they do not own undivided interests in the same property. We must determine the legal relationship of the working interest owners under the terms of their Operating Agreement and any trade usage or industry custom incorporated therein.

¶ 3 The Deputy well was completed by Conoco, the operator, as an oil and gas well on October 5, 1981. On November 9, 1981, the Deputy well first went on line for gas sales from Conoco to Producer's Gas Company as purchaser. In February 1982, defendant Samson contracted to sell its share of the gas produced to El Paso Natural Gas. In March 1982 the plaintiffs contracted to sell their share of gas to Producer's Gas Company.

1. The trial judge ruled that all of plaintiffs' claims under 52 O.S. §§ 540 et seq. more than three years prior to filing the lawsuit were time barred. The Court of Civil Appeals noted that the undisputed evidence was that Samson was not overproduced during the three years immediately prior to the lawsuit, so no § 540 issues remained.

¶ 4 In late 1982, Producers stopped taking gas from Conoco and the plaintiffs, under the *force majeure* clause in the contract. Conoco sued Producers for breach of contract. Plaintiffs did not sue Producers because their contract provisions were different. On February 21, 1984, plaintiffs terminated their gas purchase contract with Producers. While plaintiffs and Producers were in conflict, plaintiffs did not sell any gas from November 1982 through November 1984 (except for the month of April 1983). Producers had the only pipeline connection to the Deputy well and during the contract dispute period, Conoco, the operator, flowed gas from the Deputy to Producers, which allocated 100% of the gas to Samson's purchaser, El Paso Natural Gas.

¶ 5 In March 1989, Samson offered its interest in the Deputy 21–1 well bore for sale at auction, along with interests in other wells. Three days before the auction, plaintiffs objected to the sale and demanded cash balancing from Samson within thirty days. The interest was sold at auction but, before the assignment was recorded, Samson rescinded the sale. Plaintiffs sued for: 1) an accounting under the Sweetheart Gas Act, 52 O.S. § 540 et seq., 2) conversion, and 3) the common law remedy of equitable accounting and cash balancing. The previous trial judge in the case gave judgment for Samson on the plaintiff's conversion claims, and, in a second order, held that the plaintiffs' claims under the Sweetheart Gas Act were time barred. The plaintiffs' claim for cash balancing was the sole issue remaining for trial.

¶ 6 The district court ordered pre-depletion cash balancing based on its determination that balancing in kind was not physically possible because Samson had sold more than its share of estimated reserves and that gas balancing at depletion would be inequitable. The trial court held that the sale of Samson's interest in the Deputy well in 1989 was an act in derogation of plaintiffs' rights and created a basis for cash balancing. The trial judge found that postponing an accounting and cash balancing would be "entirely inequitable and unjust to plaintiffs." The trial court awarded plaintiffs $828,882.84 based upon an overbalance of 201,234 MCF at a

weighted average price of $4.119 per MCF, representing the average of prices received during the months Samson was overproduced. Upon motion by plaintiffs, the trial court awarded plaintiffs prejudgment interest, under 23 O.S. § 6, at the rate of 12% per annum set out in 52 O.S. § 540, in the amount of $1,025,718.52 for the period from July 1983 through October 22, 1993. Plaintiffs were awarded $77,256.34 in attorney fees under 52 O.S. § 540. On appeal, the Court of Civil Appeals found as a matter of law that the parties were not cotenants and that therefore the statute of limitations began to run when they first could have brought a claim for being under-produced. We granted certiorari.

¶ 7 We find that the trial court did not err in allowing pre-depletion cash balancing, but that the trial court erred in awarding an attorney fee to plaintiffs, and in the calculation of pre-judgment interest. We find that the right to demand cash balancing was triggered by Samson's attempted sale of its interest and that prejudgment interest should run from the date plaintiffs made demand on Samson.

■ ¶ 8 The working interest owners in the Deputy 21–1 well are cotenants as to the oil and gas produced and sold therefrom, by virtue of their Joint Operating Agreement. The Joint Operating Agreement (hereinafter "JOA") dated May 1, 1981 is the 1956 Form 610, covering all of Section 21, Township 12 North, Range 16 West, Custer County, Oklahoma. The ownership clause in Part 4 states that all of the parties and their respective percentages or fractional interests under the agreement are listed in Exhibit A, and provides in pertinent part:

"... Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the unit Area shall be owned, by the parties as their interests are given in Exhibit "A". *All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.*" (emphasis added)

¶ 9   The ownership clause of this operating agreement creates a cotenancy as to production from the contract area. *See, for example, Reserve Oil, Inc. v. Dixon,* 711 F.2d 951, 952 (10th Cir.1983) (the contract vests ownership of the oil and gas produced from the wells in the parties in the same percentage that they own interests in the well); *See also, Pierce, The Law of Disproportionate Gas Sales,* 26 Tulsa L. Jour. 1 (1990). The ownership clauses in the 1977 and 1982 model form operating agreements, on the other hand, specifically provide that they shall not be deemed a cross-conveyance of interests. *Id.*

¶ 10   The JOA also provides that each owner *shall* take its share of production in kind and separately dispose of it. The take-in-kind clause provides:

> "Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area . . . Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party."

█  ¶ 11   The two provisions of the JOA are contradictory with respect to the legal relationship between the parties. The ownership clause creates a cotenancy in the oil and gas produced, but the take-in-kind provision is antithetical to a cotenant-like relationship.[2]  Requiring each owner to take and separately market its gas may cause gas imbalances to occur, but no provision is made in the JOA for balancing among the separately selling owners.

¶ 12   The "take in kind" provisions are included in operating agreements to avoid the tax consequences of being classified as an association taxable as a corporation, *Kuntz, Gas Balancing Rights and Remedies in the Absence of a Balancing Agreement, Mineral Law Institute, § 13–1.*  Professor Kuntz further notes the general assumption that parties who take in kind own the gas taken, while the gas of the party not taking in kind remains in the ground. But, in the absence of a balancing agreement, he notes that this intention is not expressed in the usual operating agreement. *Id. at § 13.04.*  Professor Kuntz observes that the ownership provision has the literal effect of making the owners cotenants in the oil or gas produced, which would render the taking in kind provision meaningless. *Id.*

¶ 13   It is possible to reconcile the two provisions by finding that the ownership clause creates a cotenant-like relationship between the parties as to the gas sold, but that each owner has the right to separately take and market its own share, subject only to a duty to account to the other owners. *See, Anderson v. Dyco Petroleum Corp.,* 782 P.2d 1367 (Okla.1989) (working interest owners in well were tenants in common and any cotenant could take, subject only to a duty to account to the other cotenants.)  Oklahoma's Sweetheart Gas Act created a statutory cotenancy as to gas produced after the effective date of the Act.[3]

---

**2.**  *See, Pierce, Disproportionate Gas Sales, 26 Tulsa L.J. 135, 145 (1990); Kuntz, Gas Balancing Rights and Remedies in the Absence of A Balancing Agreement, Mineral Law Institute § 13.04[3]*

**3.**  Title 52 O.S. § 544 of the Sweetheart Gas Act, effective May 3, 1983, provided that after the effective date of the act:
  ". . . an owner of a well producing natural gas or casinghead gas may produce daily from the well that amount of gas which may be lawfully produced therefrom. *The amount of gas produced daily, irrespective of the owner producing, belongs to, is owned by, and shall inure to the benefit of each owner in the well in proportion to each owner's interest in the well.*  Each owner who produces natural gas . . . and who separately sells or otherwise disposes of the gas must account to each other owner in the well not selling or otherwise disposing of gas

from the well for that owner's party of the gas so disposed of or sold. In addition, each selling or disposing owner must compensate each owner not selling or disposing of gas from the well for that owner's proportionate part of the gas disposed of or sold."
  We held in *Seal v. Corporation Commission,* 725 P.2d 278 (Okla.1986), *app. dismissed,* 479 U.S. 1073, 107 S.Ct. 1265, 94 L.Ed.2d 126 (1987) that the Act was not retroactive, so did not apply to imbalances existing on the Act's effective date.
  Section 544 was amended by the Natural Gas Market Sharing Act, Laws 1992, c. 190 § 24, effective Sept. 1, 1992, renumbered as § 581.7 of the Act. Section 581.7 removed the joint ownership language, providing instead:
  "On or after the effective date of the Natural Gas Market Sharing Act, an owner of a well producing natural gas or casinghead gas may produce from the well that amount of gas

¶ 14 Samson argues that the parties provided that any balancing would be in kind, based on a typewritten addendum to the JOA, "Section 31, Other Conditions. Paragraph C:

*To facilitate volumetric adjustment of gas imbalances which may occur,* Non–Operator shall furnish the Operator by the last day of each calendar month following month of actual production and sale ... the total volume of gas sold by Non–Operator ... Within sixty (60) days after end of each report period *Operator shall furnish to Non–Operator an allocation statement reporting:* (1) the total volume of gas produced and the volumes of gas flared or used in lease operations during the report period; (2) *the volumes of gas sold or taken in kind by Operator and each Non–Operator during the report period;* and (3) *the accumulated volumes of gas to which Operator and Non–Operator has been entitled, the accumulated volumes of gas sold or taken in kind by Operator and each Non–Operator since the effective date hereof, and the accumulated overage and underage of each party."*

We agree that a reading of the agreement indicates that it was *contemplated* that imbalances would be made up in-kind. However, balancing in kind did not occur at the time the imbalances were created. There is no indication that the parties intended to limit the remedies available to an under-produced party by the above provision.

¶ 15 The record reflects that on two occasions, March 27, 1985 and February 11, 1986, Plaintiffs made demand upon the operator, Conoco, Inc., to volumetrically adjust their take to make up for their underage. Samson stopped selling gas for a time from February 1986 through December 1987, but the parties were not brought into balance. The majority of the overage was in the early months after the well was brought on line, at a time when plaintiffs were negotiating a gas purchase contract with Producers and again when Producers refused to take under the existing contract with plaintiffs.

¶ 16 Samson argues that the parties are not cotenants and that therefore the statute of limitations has run on plaintiffs' claims. We disagree. The parties are cotenants in production from the well, and the statute of limitations does not begin to run until ouster or termination of the relationship. *See, Ludey v. Pure Oil Co.,* 157 Okla. 1, 11 P.2d 102 (1932). As cotenants, there existed mutual open and current accounts between the parties and an under-produced party could wait until well depletion to demand cash balancing. Accordingly, the statute of limitations would not begin to run until ouster by one cotenant of the other cotenant, which occurred when Samson attempted to sell its interest. Plaintiffs immediately made demand for cash balancing and filed suit shortly thereafter. Samson recognizes that cash balancing upon depletion would be a proper remedy.

¶ 17 Furthermore, Samson's assertion on appeal that the parties are not cotenants is contradictory to Samson's own pleadings before the trial court. Samson successfully defended against plaintiffs' conversion claims by arguing before the trial court that the parties were tenants in common and that therefore the only remedy available to the plaintiffs was for an accounting. On appeal, parties are bound by theories tried below and cannot secure reversal by assuming a position inconsistent with that taken at trial. *See, Smith v. Gooding,* 100 Okla. 230, 229 P. 269 (1924).

¶ 18 Plaintiffs argue that when Samson sold its interest in the Deputy well, this was an act in derogation of plaintiff's rights and triggered immediate cash balancing. We agree. The trial court correctly determined that the sale of Samson's interest was an action in derogation of plaintiff's rights, which entitled plaintiffs to seek cash balancing. Samson argued that it rescinded the sale and that balancing in kind was therefore possible. The trial court determined, however, that balancing in kind was not feasible

---

which may be lawfully produced therefrom; however, the foregoing shall not diminish the rights of each owner against an overproduced owner by reason of such production, such as

the right to an accounting as among co-owners and the right to balance in cash or in kind, as those rights may otherwise be established by law or contract."

because of the large overage. The reserve estimates were vastly different, and the parties own actions reflected their varying beliefs about the available reserves. Whether the well was depleting was a disputed question of fact for the trial court. We do not find the trial court's holding in this case of equitable cognizance to be against the clear weight of the evidence. *Story v. Hefner*, 540 P.2d 562 (Okla.1975).

¶ 19 There is a dearth of case law on gas balancing issues. Oklahoma case law makes clear, however, that three methods of balancing are incorporated into the common law by industry custom and usage. *Anderson v. Dyco Petroleum Corp.*, 782 P.2d 1367 (Okla. 1989); *Beren v. Harper Oil Company*, 546 P.2d 1356 (Okla.App.1975). *See also, United Petroleum Exploration Inc. v. Premier Resources, Ltd.*, 511 F.Supp. 127 (W.D.Okla. 1980). We have said that gas balancing is incorporated into the JOA through industry custom and usage. *Heiman v. Atlantic Richfield Co.*, 891 P.2d 1252 (Okla.1995), *referring to Hull v. Sun Refining and Marketing Co.*, 789 P.2d 1272 (Okla.1989).

¶ 20 We said recently in *Oxley v. General Atlantic Resources Inc.*, 936 P.2d 943, 946 (Okla.1997):

"Custom and usage should be considered when interpreting a contract. 15 O.S.1991 § 162. This would especially be true when construing the JOA in the present case, which is based upon a standard form in use in the oil and gas industry since 1956. In *Heiman v. Atlantic Richfield Co.*, 891 P.2d 1252, 1257 (Okl.1995), we noted that a JOA incorporates custom and usage. In *Hull v. Sun Refining and Marketing Co.*, 789 P.2d 1272, 1278 (Okl.1989), we defined 'usage' as a 'practice or method observed with regularity with respect to the transaction being performed.'"

In that case we said that if the evidence on remand showed that it is the custom and usage in the industry that vote changes are not permitted, then the JOA should be so interpreted.

¶ 21 In *Anderson v. Dyco Petroleum Corp.*, 782 P.2d 1367 (Okla.1989), in rejecting plaintiffs' conversion claim, we said that the working interest owners in the well were tenants-in-common under Oklahoma law and that, as tenants in common, any cotenant could take, subject only to a duty to account to the other cotenants for their shares. The provision of the Operating Agreement that permits each owner to take and market its share of production in kind anticipates that any owner may take at any time. We defined three methods of gas balancing in Oklahoma: balancing in kind, periodic cash balancing prior to depletion, and cash balancing at depletion. As to the relationship between the tenants-in-common, we said:

"The law has been settled for some time that a producing cotenant must account to a non-producing cotenant for the market value of the production less any reasonable and necessary expenses of developing, extracting and marketing. Further, certain practices of the industry have been acknowledged by the courts to remedy situations ... where only certain working interest owners have sold production. These practices involving balancing in kind the production from the well by allowing cotenants like appellants the opportunity to market gas from the well (i.e., taking a certain percentage of an overproduced party's gas until any imbalance in the cotenant's takes from the well are made up), by periodic cash balancing whereby underproduced co-tenants receive cash from producing cotenants in proportion to their respective interests and cash balancing upon any particular gas reservoir's depletion. Instead of bringing an action for accounting or relying on one of the potential solutions set forth above, Appellants sought instead to turn what should have been largely an equitable proceeding into a tortious one not sanctioned by Oklahoma law."

¶ 22 In *Beren, supra*, a split-stream connection involving two gas purchasers connected to the well had caused imbalances to occur soon after the well was placed on line when ONG did not take all of the gas that was attributable to its sellers. As in the case at bar, the well was spaced as a 640–acre unit for the production of gas, and there was no gas balancing agreement between the parties, so the question of balancing was "left

open." The Court of Civil Appeals noted that the operator could not balance the take of the two gas purchasers due to the high line pressure of ONG, and that the operator had no alternative other than to sell the gas produced from the reservoir to the defendants' purchaser. The Court of Civil Appeals pointed out that the cause of the imbalance, the split connection, had since been eliminated. The parties stipulated that plaintiff was underproduced by 163,702 MCF and the issue before the court was to determine how to bring plaintiff into balance with the defendants. The Court of Civil Appeals, after discussing the industry preference for balancing in kind, stated:

> "While balancing in kind, based on custom and usage, may be apropos in many instances where imbalance exists, under the particular facts of this case which establish that the well is depleting; that this cause of imbalance, i.e., the split connection has been eliminated and there is no immediately foreseeable continued imbalancing *(sic)* in production because there is but one purchaser of gas from the well; the equities dictate an immediate accounting and cash balancing between the owners of interests in the well."

¶ 23  In *Heiman v. Atlantic Richfield Co.,* 891 P.2d 1252, 1257 (Okla.1995), we said that pre-depletion cash balancing as industry custom and usage is incorporated into the joint operating agreement and the agreement's silence on periodic equitable cash-balancing does not strip a party of the equitable remedy incorporated into the agreement. We stated, at page 1267:

> "In *Seal* we explained why the Sweetheart Act came into being, and said that prior to the Act (as is the case here) under gas balancing contracts the non-selling owners were denied the use of funds from the sales, balancing of rights occurred upon well depletion, and 'there was no guaranty that the selling owners who received more than their pro rata share of proceeds would be capable, regardless of the obligation, to satisfy their liabilities after balancing of rights.' (citations omitted) The Sweetheart Act was to remedy this by requiring revenue distribution upon

sale. This means that, in the absence of an agreement to the contrary, a pre-Act sale such as this was not the sale of gas belonging to the underproduced party. Our opinions are consistent with this view. See *Anderson v. Dyco Petroleum,* 782 P.2d 1367, 1372 (Okla.1989) where we explained remedies for interest owners, and the rights of each cotenant to develop and market production. This summarizes the general rule that pre-depletion cash-balancing was not required for every well prior to the Sweetheart Act. *Pursuant to this rule, ARCO did not sell gas to which Heiman was legally entitled between April 5, 1982 and May 3, 1983.* Section 540 [of Title 52] does not apply because Heiman was not legally entitled to share in the sale proceeds on the dates of sale occurring between April 5, 1982 and May 3, 1983."

¶ 24  We explained that *Beren v. Harper Oil Co., supra,* provided that a court may order pre-depletion cash-balancing and that such an order is one in equity based upon the circumstances of the particular case before the court. We said that by its reliance on *Beren* and its awarding prejudgment interest from May 3, 1983, the trial court in *Heiman* made the determination that plaintiffs were entitled to pre-depletion period balancing because the equities called for such balancing on May 3, 1983. ARCO had disputed whether that kind of proceeding was cognizable.

■ ¶ 25  We also pointed out in *Heiman* that we previously had rejected the argument that an action for accounting was premature when brought prior to well depletion, in *Frost v. Ponca City,* 541 P.2d 1321 (Okla.1975). We expressly rejected ARCO's argument in *Heiman* that prior to the Sweetheart Gas Act, an underproduced party's sole remedy was for accounting at well-depletion. *Heiman* and other cases indicate that the method of balancing to be employed will depend on the equities in each case. If the rights of the parties have not been changed by their contractual agreements, or by statute, the common law duty of a tenant-in-common producing oil and gas from the common property is to account to his cotenants for their proportionate share of the market value of the oil and gas produced, less the

reasonable and necessary costs of developing, extracting and marketing the same. *Mershon v. Essley,* 204 Okla. 660, 233 P.2d 293 (1951); *Moody v. Wagner,* 167 Okla. 99, 23 P.2d 633 (1933). *See also, Earp v. Mid–Continent Petroleum Corp.,* 167 Okla. 86, 27 P.2d 855 (1933), which established that owners of undivided interests in mineral estates are cotenants and that each cotenant can develop the mineral estate, subject only to a duty to account to the other cotenants.

¶ 26  We have said that neither the statute of limitations nor laches applies where one cotenant is in possession of land by right of his probate homestead, and such possession will not be deemed to be adverse to cotenants out of possession without a clear showing of the adverse claim being brought home to them. *Bevan v. Shelton,* 469 P.2d 245 (Okla.1970). Also we have said that the statute does not begin to run against members of a joint venture until the end of the joint venture. *Bailey v. Murdock,* 421 P.2d 639 (Okla.1966). *See also, Swartz v. Dennis,* 208 Okla. 334, 255 P.2d 923 (1952). As to the application of laches to cotenants, we have said that laches means not merely delay, but delay that works disadvantage to another. *Bailey v. Murdock, supra.*

¶ 27  In the absence of a complete denial or ouster, the statute of limitations has no place in an action between cotenants or tenants in common for an accounting of rents and profits. *Ludey v. Pure Oil Co.,* 157 Okla. 1, 11 P.2d 102, 104 (1932). The statute of limitations does not begin to run until the termination of that relationship.

¶ 28  In *Frost v. Ponca City,* 541 P.2d 1321, 1325 (Okla.1975) we rejected the City's argument that an accounting was premature and that City should not be required to account until all need for future cautionary action has come to an end and the necessary costs could be obtained. The City contended that if an accounting were ordered, it was entitled to credit for all costs incurred in the operation because the parties had stipulated that future operations of the wells would be required for continued safety of persons and property and that City would incur further costs, at a time when revenues will be infinitesimal. The City contended that it should

be allowed to set off future costs against past revenues. We concluded that reason and justice dictated that the city retain a portion of the proceeds to reimburse it for expenditures made to protect plaintiffs' property. We said that the city should be allowed to retain an amount sufficient to include a reasonable amount to reimburse City for future expenditures it would incur for purposes of preventing recurrence of the hazardous situation.

¶ 29  The Tenth Circuit rejected the cotenancy argument in *Doheny v. Wexpro Co.,* 974 F.2d 130 (10 Cir.1992), applying Wyoming law. The Tenth Circuit held that a contract interpretation applied to the parties' joint operating agreement did not support a conclusion that the parties were tenants in common. In-kind balancing was ordered in that case, where no gas balancing contract had been entered into between the parties.

¶ 30  *Weiser–Brown Oil Co. v. Samson Resources Co.,* 966 F.2d 431 (8th Cir.1992), applying Arkansas law, held that an assignee of the underproduced party was not entitled to recoup the underproduced gas from the over-produced party where no specific language in the assignment so provided. The underproduced (Mobil) and over-produced (Samson) parties were tenants in common of the oil and gas leases and, where there was no gas balancing agreement, the court held that the underproduced party had no contractual right to the underproduction, but held only the right to an accounting between cotenants. Because the court found that this right was personal to Mobil and did not run with the land to the successive tenant, Weiser–Brown, under the terms of the contract of assignment, there was no specific intent to assign the right to the assignee.

[11, 12]  ¶ 31  In cases of equitable cognizance, this Court is not bound by the reasoning of trial court or by its findings but will examine the whole record, consider and weigh the evidence, and if the law and facts warrant, will affirm the judgment if trial court reached the correct ultimate conclusion. *Public Service Co. of Okla. v. Home Bldrs. Assn. of Realtors,* 554 P.2d 1181 (Okla. 1976). In a case of equitable cognizance, a judgment will be sustained on appeal unless

it is found to be against the clear weight of the evidence or contrary to law or established principles of equity. *Story v. Hefner,* 540 P.2d 562 (Okla.1975). On appeal in a case of equitable cognizance, the court will examine the record and weigh the evidence. *Id.*

¶ 32 We have reviewed the record and find that the trial court's judgment allowing pre-depletion cash balancing at a weighted average price was not against the clear weight of the evidence. Though Samson argues that *United Petroleum Exploration v. Premier Resources,* 511 F.Supp. 127 (W.D.Okla.1980) dictates an award at the lowest price received where underproduction was through the "fault" of the underproduced party, there was no finding of fault on the part of the underproduced parties in the case at bar, and the *United* court determined that the value of the gas produced would be determined at the price actually received by the overproduced party. As pointed out by plaintiffs, a weighted average price reflects the actual prices received at the time of Samson's greatest overproduction.

¶ 33 Samson's final argument about price is that the trial court erred in not deducting royalties and gross production taxes from the gross price received by Samson. Both sides offered exhibits with their calculations of proceeds potentially due to the plaintiffs, based on varying sizes of overage, and varying prices. Plaintiff's calculations, prepared by Martindale, Inc., did not deduct royalty and gross production tax. Samson's exhibits calculated net proceeds at three different prices, with gross production tax of 7.085% and 1/8 royalty deducted. The trial judge, as the trier of fact and after examining all the evidence, specifically adopted the Martindale calculations in awarding damages to plaintiffs. We have been directed to no proof before the trial court that gross production tax or 1/8 royalty had actually been paid. The statement attributed to Samson's vice president was ambiguous and the trial court was justified in determining that Samson's proof did not rise to the level of acceptable evidence to the trier of fact.

¶ 34 We find, as set out below, that the trial court erred in awarding attorney fees to the plaintiffs, and in the computation of pre-judgment interest at the rate of 12% per annum from July, 1983. We affirm the trial court's judgment ordering immediate cash balancing in the amount of $828,882.84, but reverse the award of attorney fees, and the amount of prejudgment interest awarded, as discussed below.

## INTEREST AND ATTORNEY FEES

¶ 35 Samson argues that the trial court erred in awarding prejudgment interest and attorney fees to the plaintiffs in this action. Ordinarily there is no right to an attorney fee in an equitable action in the absence of statute. Title 52 O.S. 1991 § 540, provided for the awarding of interest and attorney fees in *actions brought pursuant to the Act.* Section 540 required that payment of proceeds derived from the sale of oil or gas production shall be paid to the persons legally entitled thereto within six months after the date of first sale, payment to be made to the persons entitled thereto by the first purchasers of such production.

¶ 36 Plaintiffs sued for pre-depletion cash balancing. We said in *Heiman* that an action for pre-depletion cash balancing is one in equity based upon the particular case. The case at bar is a case of equitable cognizance, and thus the statute allowing attorney fees to the prevailing party under the Sweetheart Gas Act does not apply. There is no statutory basis for an award of attorney fees to plaintiffs.

¶ 37 Generally prejudgment interest is not due in the absence of statute. Where the amount due is unliquidated and not certain until rendition of judgment by the trial court, interest does not begin to run until rendition of judgment. *See, Essley v. Mershon,* 262 P.2d 417 (Okla.1953).

¶ 38 Plaintiffs rely upon *Heiman v. Atlantic Richfield Co., supra,* and 23 O.S. § 6 as authority for the award of prejudgment interest in this case. *Heiman* clearly states that the prejudgment interest awarded there was not based upon the Sweetheart Gas Act, and recognizes that the action was for equitable cash balancing. Relying upon 23 O.S.

§ 6,[4] we found that a sum certain was due to Heiman on May 3, 1983, and awarded interest from that date at the rate of 6% per annum based upon 15 O.S. § 266, which provides:

"Legal and Contract Rates of Interest.

The legal rate of interest shall be six percent (6%) in the absence of any contract as to the rate of interest, and by contract parties may agree to any rate as may be authorized by law, now in effect or hereinafter enacted."

¶ 39  In *Heiman,* the imbalance in production ended on May 3, 1983, with no foreseeable imbalances between the parties. Prior to that date, Heiman had made repeated demands upon ARCO to allow Heiman to contract with its purchaser and for periodic cash-balancing payments. ARCO was notified that Heiman had selected periodic cash payments for balancing and would not wait for well depletion. We said that the trial court's determination that interest began to run from May 3, 1983, necessarily included a finding that the equities supported cash balancing on that date.

¶ 40  In *Heiman,* after recognizing that prejudgment interest is not usually awarded in the absence of statutory authority, we said that interest may run from the date that the claim was both certain and the party had a right to the principal. Title 23 O.S. § 6 specifies a right to recover damages certain or capable of being made certain by calculation where the right to recover vested upon a particular day. In the case at bar, plaintiffs' demand for immediate cash balancing notified Samson that plaintiffs had elected to demand cash balancing and would not wait until well depletion to balance. The damages were capable of being made certain by calculation on that date. Prejudgment interest should begin to run from March 20, 1989, the date on which plaintiffs demanded cash balancing from Samson, at the rate of six percent per annum pursuant to 15 O.S. § 266. *Heiman v. Atlantic Richfield,* 1995 OK 19, 891 P.2d 1952.

4.  § 6. Right to Recover Interest upon Damages. Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled

¶ 41  The judgment of the trial court is affirmed in part and reversed in part, with directions. The trial court's award of cash balancing in the amount of $828,882.84 is affirmed. The award of attorney fees to plaintiffs is reversed. The award of prejudgment interest to plaintiffs is reversed, with directions to enter judgment for prejudgment interest calculated at six per cent per annum from March 20, 1989 to October 22, 1993.

CERTIORARI PREVIOUSLY GRANTED; THE OPINION OF THE COURT OF CIVIL APPEALS IS VACATED; THE TRIAL COURT'S JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART, WITH DIRECTIONS.

¶ 42  KAUGER, C.J., HODGES, LAVENDER, SIMMS, HARGRAVE, OPALA and WATT, JJ., concur.

¶ 43  ALMA WILSON, J., concurs by Stare Decisis.

¶ 44  SUMMERS, V.C.J., concurs in result.

also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.