2003 OK CIV APP 95

UNIT PETROLEUM COMPANY, Unit 1986 Energy Income Limited Partnership, and Unit 1987 Employee Oil and Gas Limited Partnership, Plaintiffs/Appellants,

v.

MOBIL EXPLORATION AND PRODUCTION NORTH AMERICA, INC., and Mobil Oil Corporation, Defendants/Appellees,

and

BP Amoco Corporation, Intervenor/Third-party Plaintiff/Appellee,

v.

Gothic Energy Corporation, Third-party Defendant/Appellee.

No. 97,837.

Court of Civil Appeals of Oklahoma, Division No. 2.

March 11, 2003.

Rehearing Denied May 23, 2003.

Certiorari Denied Sept. 8, 2003.

Richard P. Hix, Richard J. Eagleton, S. Gregory Frogge, Doerner, Saunders, Daniel & Anderson, L.L.P., Mark E. Schell, Tulsa, OK, for Appellants.

Robert P. Costello, Freda L. Williams, Oklahoma City, OK, for Appellees.

Opinion by JOE C. TAYLOR, Presiding Judge.

¶1 Plaintiffs, Unit Petroleum Company, Unit 1986 Energy Income Limited Partnership, and Unit 1987 Employee Oil and Gas Limited Partnership (collectively, Unit), seek review of the trial court's grant of summary judgment in favor of Defendants, Mobil Exploration and Production North America, Inc., and Mobil Oil Corporation (collectively, Mobil); Intervenor/Third–Party Plaintiff, BP Amoco Corporation (Amoco); and Third–Party Defendant, Gothic Energy Corporation (Gothic). The case concerns balancing of gas production from a Dewey County, Oklahoma, well. The issues are (1) whether Mobil's sale of its interest to Amoco in 1997 entitled Unit to demand immediate cash balancing from Mobil as a matter of law and without a balancing of equities; and (2) whether the trial court's entry of summary judgment was proper under the facts presented. We answer both questions in the negative, and reverse and remand for further proceedings.

¶2 Many of the underlying facts are undisputed. Until February 1997, Mobil and Unit were working interest owners in the USA Spaid #1–5 well in Dewey County. Unit, which is currently an owner, owns approximately 6.3 % interest, and Mobil owned approximately 52.9 % interest. On February 28, 1997, Mobil sold its interest to Amoco, which in November 1997 sold the interest to Gothic. At the time Mobil sold its interest to Amoco, Mobil's interest was overproduced by at least 158,101 mcf, and Unit's was underproduced by at least 50,425 mcf. Amoco and Gothic, respectively, assumed operation of the well.

¶3 The JOA between Unit and Mobil was a 1956 "Model Form Operating Agreement," which contains an ownership clause that states in relevant part:

> Unless changed by other provisions, all costs and liabilities incurred in operations under this contract shall be borne and paid, and all equipment and material acquired in operations on the Unit Area shall be owned, by the parties as their interests are given in Exhibit "A". All production of oil and gas from the Unit Area, subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner.

There is no separate gas balancing agreement between or among the parties, though the JOA recognizes each working interest owner's right to take production "in kind."

¶4 For purposes of the summary judgment motion, it was undisputed that Amoco agreed to indemnify Mobil, and Gothic agreed to indemnify Amoco, for liabilities associated with gas balancing. Neither Mobil nor Amoco obtained Unit's prior consent to their respective assignments of the interest now owned by Gothic, however, and correspondence submitted by Unit indicates that, for several months during mid–1997 and early 1998, Amoco and Gothic were unresponsive to Unit's requests to take make-up gas. In November 1997, Unit made demand on both Mobil and Amoco for immediate cash balancing, and was refused. In March 1998, however, Unit was permitted to begin balancing in kind on a monthly basis, and Gothic does not now dispute Unit's right under the JOA to balance in kind. Gothic represented in court filings that Unit is currently "balancing in kind at a rate which is approximately double the monthly production volumes [it]

would be entitled to based on [its] decimal ownership interest in the well," and that Unit would "remain in a make up status until [its] interest is fully made up."

¶5 The parties agree the well has sufficient reserves for Unit to eventually balance in kind and, as of September 2001, Unit was 44,670 mcf underproduced. Most of Unit's underproduction accumulated between mid-1988 through mid-1997, and was due to Unit's lack of a gas purchaser during that period

¶6 Unit filed this action against Mobil on February 22, 1999, alleging that the terms of the JOA, Mobil's overproduced status in the well, and the assignment of Mobil's interest to Amoco entitled Unit to an accounting and immediate cash balancing. Mobil's answer denied Unit's right to cash balance, and asserted, among other affirmative defenses, the statute of limitations and laches. By mid-2001, Amoco had been permitted to intervene in the action and to bring in Gothic as a third-party Defendant. Mobil and Amoco continued to assert Gothic had assumed liability for any imbalances in production.[1] Though it later accepted defense of the case, Gothic also initially denied liability.

¶7 Unit moved for summary judgment on the issue of whether it was entitled to immediate cash balancing as a matter of law. It argued that the JOA created a cotenancy in production, and, under the Supreme Court's decision in *Harrell v. Samson Resources Co.*, 1998 OK 69, 980 P.2d 99, cash balancing became *mandatory* immediately upon Mobil's sale of its interest—i.e., upon the termination of Mobil's cotenant relationship with Unit. Mobil, Amoco, and Gothic objected, asserting that cash balancing was not warranted based on a balancing of the equities in the case, which they asserted included the fact that balancing-in-kind is "preferred" in the industry when the reserves are sufficient, and that "[n]o equitable consideration overrides this presumptively preferred method of balancing." They also argued the statute of limitations begins running on a claim between co-tenants upon "ouster" of one cotenant by another, and that ouster had not occurred because Gothic had assumed liability for balancing and had honored Unit's right to take in kind. Although it is clear from the record that Mobil claims it is entitled to indemnity from Amoco and/or Gothic for Unit's claim, it is not clear whether Mobil denies that it has any further personal liability to Unit for Mobil's overproduction.

¶8 The trial court refused to order cash balancing.[2] The court rejected Unit's argument that *Harrell* mandated immediate cash balancing solely on the basis of Mobil's sale of its interest, and found the equities did not require immediate cash balancing. The court also specifically found that the statute of limitations had not yet started to run on Unit's claim, inasmuch as "there was no act in derogation of Unit's rights triggering cash balancing." The court did not delineate what would constitute such "derogation," however, nor did it address the issue of Mobil's future liability to Unit for Mobil's overproduction.

¶9 Unit appeals, asserting as it did in the trial court that, under *Harrell*, Mobil's severance of its interest in the well triggered Unit's right to an immediate cash balancing without a balancing of equities. Unit also asserts that Mobil may not escape liability for its obligation to Unit by assigning those obligations to subsequent purchasers.

¶10 In *Harrell*, the Oklahoma Supreme Court interpreted ownership and take-in-kind provisions of a JOA identical to those in the JOA between Unit and Mobil. There, the Court held the provisions created "a cotenant-like relationship between the parties as to the gas sold," with each owner having the right to separately take and market its own share, "subject only to a duty to account to the other owners." 1998 OK 69, ¶13, 980 P.2d at 103. The duty to account imposes an obligation on a cotenant who

---

1. Mobil also asserted a counterclaim against Unit for unpaid expenses associated with well operations. The counterclaims were dismissed without prejudice prior to the trial court's ruling that led to the judgment appealed from here.

2. The trial court specifically granted summary judgment to Mobil, stating: "Because the only relief that Unit seeks in this case is immediate cash balancing, the effect of this Order and Judgment is to resolve all issues, with respect to all parties, before this Court."

removes common property to account to its cotenants "for their proportionate share of the market value of the oil and gas produced less the reasonable and necessary cost of developing, extracting, and marketing the same." *Moody v. Wagner,* 1933 OK 416, 23 P.2d 633 (syllabus 4); *see also Prairie Oil & Gas Co. v. Allen,* 2 F.2d 566, 574 (8th Cir. 1924).

¶ 11 As to wells from which production "takes" are out of balance among cotenants, if there is no specific provision or other agreement governing the situation—as is the case here—Oklahoma courts have recognized three methods by which overproduced cotenants may "account" to underproduced owners and bring the well into balance: (1) balancing in kind; (2) periodic, pre-depletion cash balancing; and (3) cash balancing upon reservoir depletion. *See Harrell,* 1998 OK 69, ¶¶ 19, 21, 980 P.2d at 105; *Anderson v. Dyco Petroleum Corp.,* 1989 OK 132, ¶ 10, 782 P.2d 1367, 1373; *Beren v. Harper Oil Co.,* 1975 OK CIV APP 49, ¶¶ 17–20, 546 P.2d 1356, 1359.

■ ¶ 12 Though the parties here agree that balancing in kind is the customary and preferred method within the industry, the ultimate determination as to the appropriate method to utilize depends on a balancing of the equities in the case. Courts have not hesitated to apply pre-depletion cash balancing in appropriate circumstances. *See, e.g., Heiman v. Atlantic Richfield Co.,* 1995 OK 19, 891 P.2d 1252; *Beren,* 1975 OK CIV APP 49, 546 P.2d 1356.[3] In fact, in *Harrell* the Court ultimately approved the trial court's determination that pre-depletion cash balancing of the underproduced plaintiffs' interests was warranted as against the overproduced Samson Resources, because "balancing in kind was not feasible" given Samson's large overage and the uncertain amount of reserves. *Id.* at ¶ 18, 980 P.2d at 104–05.

¶ 13 A significant issue in *Harrell* concerned the statute of limitations applicable to the plaintiffs' action against Samson. The plaintiffs had not filed their action until shortly after Samson sold its interest in the well at auction, but had acquiesced in in-kind balancing for more than five years prior to that time. The Court rejected Samson's argument that plaintiffs' claim was time-barred, however, finding instead that, as between cotenants, the statute did not start to run until Samson acted "in derogation of plaintiff[s'] rights" by selling its interest. *Id.* As previously noted, the Court, at the same time, upheld the trial court's order requiring cash balancing by Samson based on its finding that the well was depleting and balancing in kind was not feasible. Thus, in determining whether derogation of plaintiffs' rights had occurred so as to trigger the running of the statute of limitations and warrant pre-depletion cash balancing, the Court looked beyond the mere fact that Samson had sold its interest. Implicit in the Court's finding of derogation was its determination that the trial court's balancing of the equities was the correct approach, and the trial court's conclusion was not against the clear weight of the evidence.

¶ 14 The Court specifically relied on *Ludey v. Pure Oil Co.,* 1931 OK 527, 11 P.2d 102. *Ludey,* which also is an accounting action between cotenants in production from a well, held that the relationship among cotenants is one in the nature of a fiduciary or trust, and a tenant in common who receives the common property of the parties, e.g., a stream of production, "holds it as trustee for his cotenant to the extent of the interest of the cotenant, who may compel an accounting." *Id.* at ¶ 19, 11 P.2d at 104 (*quoting Rice v. Peters,* 128 A.D. 776, 113 N.Y.S. 40 (1908)). The limitations period in such a case, the Court said, does not start to run until termination or repudiation of the trust relationship. *Id.* at ¶ 20, 11 P.2d at 104; *see also McGee v. Harrison,* 1954 OK 299, 277 P.2d 161 (statute of limitations does not apply to trust relation-

---

**3.** But see in this regard Pierce, D.E., *"The Law of Disproportionate Gas Sales,"* 26 Tulsa L.J. 135, 167–68 (Winter 1990), where the author notes, "Regardless of what several courts and commentators *say,* balancing in kind is *not* the preferred method for resolving gas imbalances. The preferred method is whatever a court thinks is fair under the circumstances." The article also notes that, "[a]lthough there are many cases which say balancing in kind is the preferred method, the method chosen is governed by its fairness to the parties under the circumstances." *Id.* at 167 n. 149.

ship between cotenants until repudiation of such relationship); *Becker v. State ex rel. Dep't of Public Welfare,* 1957 OK 102, 312 P.2d 935 (syllabus 6) ("[s]tatutes of limitation do not begin to run in favor of a trustee who holds in trust until the trustee has clearly repudiated his trust and such repudiation has been brought to the attention of the cestui que trust").

¶ 15 Applying the foregoing to the case at bar, we find that, under the Oklahoma Supreme Court's holdings in *Harrell* and *Ludey,* Unit's right to seek cash balancing from Mobil depends on whether Mobil's sale of its interest resulted in the derogation of Unit's rights as a cotenant in production and beneficiary of the trust relationship with Mobil. This factor cannot be determined without first deciding whether Mobil repudiated its trust relationship with Unit and therefore triggered the running of the statute of limitations. Even though the well may have sufficient reserves to balance in kind, custom and usage in the industry should not be permitted to defeat, directly or indirectly, a cotenant's right to seek an accounting from a former tenant in common by precluding the cotenant from suit for a period that potentially may extend beyond expiration of the limitations period.

¶ 16 Thus, while we do not agree with Unit's argument that Mobil's sale of its interest makes cash balancing automatically mandatory, we do find that if, as part of the sale, Mobil has denied further liability for the overproduction or has otherwise repudiated its trust, then Unit may demand an accounting in the form of pre-depletion cash balancing from Mobil regardless of whether the well has sufficient reserves to balance in kind, inasmuch as Mobil will have relinquished any control it may have had over Unit's ability to balance in kind.

¶ 17 On review of a trial court's summary judgment, if our examination of the pleadings and evidentiary materials leads us to conclude the material facts which are determinative of a matter are not in dispute, and that the trial court's judgment was legally correct, we will affirm. The burden is on the movant, however, to show that no material facts are in dispute, to produce admissible evidence to support every material fact, and to show the movant is entitled to judgment as a matter of law, while the trial court must "insure that the motion is meritorious." *Spirgis v. Circle K Stores, Inc.,* 1987 OK CIV APP 45, ¶ 10, 743 P.2d 682, 685 (approved for publication by the Oklahoma Supreme Court). If admissible evidence has not been submitted to support each material fact, or if material facts are in dispute, then the motion should be denied.

¶ 18 To be consistent with *Harrell,* determination of whether derogation has occurred, so as to trigger cash balancing, requires examination and balancing of the particular facts and equities of each case. Here, the trial court balanced the equities, concluded that the statute of limitations had not started to run on Unit's claim, and thus held that derogation of Unit's rights had not occurred. However, the record reveals an unresolved issue concerning whether Mobil denies the continuation of a trust relationship with Unit—i.e., whether Mobil denies future liability to Unit for the share of Mobil's overproduction attributable to Unit. If so, then a material and determinative factor in the trial court's balancing of equities in the case is in error and entry of summary judgment was improper.

¶ 19 Accordingly, we reverse the trial court's order and remand for further proceedings consistent with the views set forth herein. In the event the court on remand determines that cash balancing by Mobil is warranted, it shall also award pre-judgment interest at the rate of six percent per annum from the date Unit first made demand for cash balancing in November 1997. *Harrell,* 1998 OK 69, ¶¶ 35–41, 980 P.2d at 108–09.

¶ 20 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

COLBERT, V.C.J., and STUBBLEFIELD, J., concur.