2010 OK CIV APP 129

**Dusty SANDERSON and Kuhn Oil Co., Inc., Plaintiffs/Appellants,**

v.

**YALE OIL ASSOCIATION, Greghol, Ca. Ltd Partnership, Parker E. Bloomer Family Partners, Limited Partnership, and Solon Bloomer, Defendants/Appellees.**

No. 106,905.

Court of Civil Appeals of Oklahoma, Division No. 4.

Sept. 20, 2010.

Certiorari Denied Nov. 16, 2010.

S. Brent Bahner, Fischl, Culp, McMillen, Chaffin, Bahner & Long LLC, Ardmore, OK, for Plaintiffs/Appellants.

Verland E. Behrens, Behrens, Tayloy, Wheeler, and Chamberlain, Oklahoma City, OK, for Defendants/Appellees.

### OPINION ON REHEARING

DOUG GABBARD II, Presiding Judge.

¶ 1 Appellees' Petition for Rehearing is granted. The Court's opinion issued on May 11, 2010 is withdrawn, and in lieu thereof this Opinion on Rehearing bearing date of September 20, 2010, is issued.

¶ 2 In this action to recover for underproduction of a gas well, Plaintiffs, Dusty Sanderson and Kuhn Oil Co., Inc., appeal the trial court's judgment in favor of Defendants, Yale Oil Association, Greghol Ca. Ltd. Partnership, Parker E. Bloomer Family Partners, and Solon Bloomer. The trial court ruled that Plaintiffs' claims were barred by the statute of limitations. We reverse and remand.

### FACTS

¶ 3 This case centers on a producing gas well known as the "Ramey" in Woodward County, Oklahoma. Defendants and Marathon Oil Company were working interest owners. Over the course of production, Defendants became overproduced, meaning they sold more than their proportionate share of gas production, while Marathon became underproduced, selling less than its proportionate share.

¶ 4 Plaintiff Sanderson purchased Marathon's interests in the well at a November 8, 1999, auction, and those interests were assigned to him effective January 1, 2000. The assignment specifically included Marathon's rights to receive "cash or in-kind balancing." Sanderson later assigned part of his interest to Plaintiff Kuhn Oil, and part to another company which is not a party to these proceedings. After the assignment, Plaintiff Sanderson began receiving his share of production plus make-up payments for his underproduced interest. Although Sanderson had not previously owned an interest in the subject well prior to his purchase from Marathon, Defendants never questioned his right to receive make-up gas or payments for the under-production attributable to his interest.

¶ 5 Production declined. In 2004, the operator gave notice it intended to plug and abandon the well. Plaintiffs and Defendants consented, although some interest owners' election to plug and abandon "was specifically contingent upon the actual plugging of the well." [1] However, one working interest owner objected and took over operations. Under Paragraph 16 of the parties' Joint Operating Agreement (JOA), abandoning parties were required to assign all their interests in the well to those continuing. Plaintiffs asserted this abandonment triggered Paragraph 32 of the JOA, the "Gas Storing and Balancing Provision," which provided that **"in the event production of gas permanently ceases prior to the time that the accounts of the parties have been balanced, a complete balancing shall be accomplished by a money settlement."** Defendants refused balancing.

¶ 6 On June 9, 2005, more than five years after obtaining Marathon's interest, Plaintiffs sued Defendants (and 17 other overproduced working interest owners, who ultimately settled) in federal district court in the northern district of Texas, seeking an accounting and damages. At Plaintiffs' request, the court dismissed the lawsuit without prejudice, for lack of jurisdiction. On September 8, 2006, Plaintiffs filed another lawsuit in federal district court in the western district of Oklahoma. On April 4, 2007, the court dismissed that lawsuit due to lack of complete diversity.

¶ 7 On April 20, 2007, Plaintiffs sued Defendants in Woodward County District Court. Plaintiffs asserted that under the JOA, they were entitled to an accounting for underproduction. Defendants argued that Plaintiffs' claim was barred by the five-year statute of limitations set forth in 12 O.S.2001 § 95 and 52 O.S.2001 § 570.10, because more than five years had passed from the time Plaintiffs acquired Marathon's interest (on January 1, 2000) until the time the first lawsuit was filed (on June 9, 2005).

¶ 8 At a non-jury trial, Plaintiff Sanderson testified and evidence was presented. After Plaintiffs rested, Defendants orally made a

---

1. According to the trial court's judgment, "Yale's election to plug the well and to abandon its interest was specifically contingent upon the ac-

tual plugging of the well." Judgment, page 2, paragraph 5.

"motion for judgment" based on the statute of limitations, and the trial court granted same, finding:

> An underproduced working interest owner in a gas well has a personal claim (does not follow title to the leasehold interest) which must be specifically transferred or assigned. *Harrell v. Samson Resources, Inc. [Co.,]* 1998 OK 69, 980 P.2d 99, 105, 107. The statute of limitations for such claims begins to run when there is an ouster or a termination of the cotenancy relationship between the underproduced party and the overproduced party. *Id.* at p. 104. When Marathon sold its leasehold and working interests in the well, as well as its personal underproduction claim at auction to the Plaintiffs, Marathon's cotenancy with the Yale Defendants was terminated and the statute of limitations began to run against the cash-balancing claim. Whether the three year limitation period or the five year limitation period applies, the first lawsuit to collect on Plaintiffs' claim was filed too late and the Plaintiffs' action is time-barred.

Later, the court awarded Defendants $47,415 in attorney fees, plus costs.

¶ 9 Plaintiffs now appeal.

## STANDARD OF REVIEW

■ ¶ 10 A defendant's motion for judgment is the equivalent to a motion for summary judgment. *Handy v. City of Lawton,* 1992 OK 111, ¶ 8, 835 P.2d 870, 872–73. The trial court resolved the case by applying a statute of limitations. Summary judgment on a statute of limitations defense is appropriate where the evidence is sufficient to support a finding of fact of the time bar and where the evidence establishes there is no dispute as to the time the limitation period began to run. *MBA Commercial Const. v. Roy J. Hannaford Co.,* 1991 OK 87, ¶ 10, 818 P.2d 469, 472–73.

## ANALYSIS

¶ 11 In *Ludey v. Pure Oil Co.,* 1931 OK 527, 11 P.2d 102, the Supreme Court noted that working interest owners who obtained their interests at different times "became as tenants in common ... Before the statute of limitations will start in favor of a tenant in common, there must have been an actual ouster by the one asserting the statute." Id. at ¶ 15–16, 11 P.2d at 104. Until that time, according to Ludey, a "trust of fiduciary relation between the parties" exists, and "[t]he statute of limitation does not begin to run until the relationship ends." *Id.* at ¶ 19, 11 P.2d at 104.

¶ 12 *Ludey* was cited by *Harrell v. Samson Resources, Co.,* 1998 OK 69, 980 P.2d 99, the decision which the trial court relied upon. Harrell involved a gas balancing dispute between working interest owners in a well. Samson, the overproduced owner, offered its interest for sale at auction and the underproduced owners objected demanding cash balancing. The Supreme Court rejected Samson's argument that the statute of limitations had already run because:

> The parties are cotenants in production from the well, and the statute of limitations does not begin to run until ouster or termination of the relationship. *See, Ludey v. Pure Oil Co.,* 157 Okla. 1, 11 P.2d 102 (1932). As cotenants, there existed mutual open and current accounts between the parties and an under-produced party could wait until well depletion to demand cash balancing. Accordingly, the statute of limitations would not begin to run until ouster by one cotenant of the other cotenant, which occurred when Samson attempted to sell its interest.

*Id.* at ¶ 16, 980 P.2d at 104.

■ ¶ 13 Although the Harrell Court held that limitations began to run on a claim against the *overproduced* interest owner when that owner (i.e., Samson) sold or attempted to sell its interest in an out-of-balance well, the same situation is not present in the case at bar. Significantly, Marathon was *underproduced* when it sold its interest to Plaintiffs. Under Harrell, had Marathon been overproduced at the time of sale, the limitations clock would have started ticking on the rights of all underproduced interest owners to seek cash-balancing from Marathon. However, no party contends that Marathon has liability for any part of the overproduction held by Defendants. In fact,

Defendants recognized Plaintiffs' title as a cotenant in the well and its stream of production, and they continued to treat Plaintiffs as they had previously treated Marathon, i.e., they recognized Plaintiffs' right as a cotenant and signatory on the Joint Operating Agreement to continue taking make-up gas.

¶ 14 Plaintiffs became tenants in common with Defendants when they purchased Marathon's interest. This fiduciary relationship continued until 2004, when Defendants (as well as Plaintiffs) elected to abandon the well and assign their interests to others. At that point, the relationship between the parties ended. Under both Ludey and Harrell, "[t]he statute of limitation does not begin to run until the relationship ends." In other words, limitations does not begin running against the cotenant (i.e., Plaintiffs) until there has been an ouster of that cotenant. Defendants' argument misconstrues Harrell by arguing that the limitations period began running in their favor merely because an underproduced interest owner (i.e., Marathon) sold its interests.

¶ 15 The trial court reached a different result because it focused on Marathon's termination of its cotenancy relationship with Defendants, and concluded that the statute of limitations began to run when Marathon sold its interests to Plaintiffs in 2000. However, *Unit Petroleum Company v. Mobil Exploration and Production North America, Inc.,* 2003 OK CIV APP 95, 78 P.3d 1238, which analyzes Harrell, is instructive on that issue. In Unit Petroleum, the overproduced working interest owner, Mobil, sold its interest to a third party. The question was whether the underproduced working interest owner, Unit, could immediately receive cash balancing as a matter of law. Division II of this Court held:

> "[The answer] . . . depends on whether Mobil's sale of its interest resulted in the

derogation of Unit's rights as a cotenant in production and beneficiary of the trust relationship with Mobil. This factor cannot be determined without first deciding whether Mobil repudiated its trust relationship with Unit and therefore triggered the running of the statute of limitations."

*Id.* at ¶ 15, 78 P.3d at 1242. The Court noted that in determining whether derogation of rights had occurred to trigger the statute of limitations, the *Harrell* Court "looked beyond the mere fact that Samson had sold its interest." *Id.* at ¶ 13, 78 P.3d at 1241.

¶ 16 In the case at bar, the rights and obligations of the overproduced and underproduced owners remained the same, the only difference being a new party now held the underproduced rights. While an underproduced working interest owner in a gas well has a personal claim which must be specifically transferred or assigned, that occurred in the instant case, through Marathon's assignment of its rights to Plaintiffs. Under Harrell, having been assigned Marathon's interest, Plaintiffs could "wait" until the relationship with Defendants ended before demanding balancing. Thus, the statute of limitations was *not* triggered by Marathon's sale of its interest to Plaintiffs, and its 2005 lawsuit was not barred.[2]

¶ 17 Defendants also assert that Plaintiffs are not entitled to balancing because Paragraph 32 of the JOA provides that a complete balancing by money settlement cannot occur until "production of gas permanently ceases," and the well has continued to produce since the date the Plaintiffs abandoned it. However, as *Harrell* explains, if the trial court determines that Defendants' abandonment repudiated its trust relationship with Plaintiffs, different remedies are available and the appropriateness thereof is dependent upon the facts and equities of the case. *See Har-*

---

**2.** Defendants' reliance on *Flanagan v. Campbell,* 1938 OK 556, 83 P.2d 865, is misplaced. In Flanagan, the Supreme Court held that limitations began running on the plaintiff mineral interest owner's claim for royalty payments at the time the owner knew or should have known that the payments were being made instead to a nonowner third party, pursuant to an assignment from the plaintiff's original grantor. The Court held that a three-year limitations period applied, running from the date the owner/plaintiff took title, finding that the plaintiff knew the defendant claimed "exclusive right and title" to the payments at that time, and that defendant's conduct constituted a "complete denial and ouster of the plaintiff." *Id.* at ¶ 6, 83 P.2d at 867. In essence, the Court held that once "ouster" occurred, the fiduciary relation of cotenants no longer existed, and, therefore, limitations began to run on the plaintiff's claim for back royalties.

*rell* at ¶¶ 19–25, 980 P.2d at 105–07; *Unit Petroleum* at ¶ 12, 78 P.3d at 1241. This is a matter for the trial court to consider on remand.

## CONCLUSION

¶ 18 Accordingly, the judgment in favor of Defendants (including attorney fees and costs) is reversed and this case is remanded for further proceedings consistent with this opinion.

¶ 19 REVERSED AND REMANDED.

GOODMAN, J., concurs, and RAPP, J., not participating.